UNITED STATES of America, Plaintiff,

v.

AMERICAN SOCIETY OF COMPOS-
ERS, AUTHORS AND PUBLISH-
ERS, et al., Defendants.

No. Civ. 13–95 (WCC).

United States District Court,
S.D. New York.

May 15, 1984.

U.S. Dept. of Justice, Antitrust Div., Washington, D.C., for plaintiff; Roger B. Andewelt, Weeun Wang, Washington, D.C., of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant American Soc. of Composers, Authors and Publishers; Allan Blumstein, Bernard Korman, Gen. Counsel, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for amicus curiae All-Industry Television Station Music License Committee; R. Bruce Rich, New York City, of counsel.

Hawkins, Delafield & Wood, New York City, for amicus curiae American Broadcasting Companies, Inc.; Philip R. Forlenza, Rafael Pastor, Terence J. Hines, New York City, of counsel.

Hughes, Hubbard & Reed, New York City, for amicus curiae Broadcast Music, Inc.; Robert J. Sisk, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for amicus curiae CBS, Inc.; John E. Beerbower, Claudia Casser, New York City, of counsel.

Cahill, Gordon & Reindel, New York City, for amicus curiae Nat. Broadcasting Co., Inc.; David R. Hyde, Patricia Farren, Sandra Baron, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge.

This action, a relic of a bygone era, stands as a living monument to a prior generation of draftsmen. The Amended Consent Judgment (the "Consent Judgment" or "Consent Decree"), originally entered on March 14, 1950, reflects their efforts to develop a workable solution to the antitrust problems arising from the business practices of defendant American Society of Composers, Authors and Publishers ("ASCAP"). Today, the terms of the Consent Decree continue to regulate the manner in which ASCAP licenses its music inventory. Pursuant to § XVII of the Consent Judgment, a Judge of this Court is assigned to oversee the ongoing implementation of these provisions. For the past nine years I have been charged with that task.

The action is currently before the Court on ASCAP's application for an Order modifying the Consent Judgment by adding to § VII the following clause:

The provisions of this Section VII shall not apply to a prospective licensee which is a telecasting network holding a blanket license from Broadcast Music, Inc. for such periods of time as the telecasting network holds such a license from Broadcast Music, Inc.

Currently, § VII contains no such express exception to the requirement that ASCAP offer a per-program license upon the written request of any unlicensed radio or television broadcaster. The government opposes the proposed modification, as do the All-Industry Television Station Music License Committee ("All-Industry"), the American Broadcasting Companies, Inc. ("ABC"), Broadcast Music, Inc. ("BMI"), CBS, Inc. ("CBS"), and the National Broadcasting Company, Inc. ("NBC"), all of whom filed *amicus curiae* briefs upon the Court's invitation. For the reasons set forth below, ASCAP's application is denied.

As Justice Cardozo once stated, "[a] continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." *United States v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932). This is true whether the injunction has been entered with the consent of the parties or following litigation. *Id.* Thus, there can be no doubt that this Court is empowered to modify the Consent Judgment in response to changed conditions, regardless of the government's opposition to the proposed modification. *See id.* The proper exercise of this power is, however, strictly limited, and ordinarily "nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions" will justify a court in altering the terms of an injunction that was entered with the consent of all concerned. *Id.* at 119, 52 S.Ct. at 464. Moreover, while a court may

modify a consent decree to effectuate its underlying purpose upon an appropriate showing that the decree has not succeeded in achieving the intended results, it may not change the decree in favor of a defendant unless the goals of the litigation as embodied in the decree have been fully satisfied or, alternatively stated, unless the dangers which gave rise to the decree have become "attenuated to a shadow." *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 248–49, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968); *Swift & Co.*, 286 U.S. at 119, 52 S.Ct. at 464.

■ Measured against this standard, AS-CAP's application to modify the Consent Judgment falls short. Based upon the current state of the industry, ASCAP contends that any requirement that it offer a per-program license to a network already holding a BMI blanket license will result in discrimination by that network against AS-CAP licensed compositions and a consequent exodus of composers from ASCAP to BMI. ASCAP asserts that as between AS-CAP and BMI licenses, networks will always choose a BMI blanket license and an ASCAP per-program license, and not the reverse. To support this doomsday premise, ASCAP relies upon the differences between the ASCAP and BMI consent decrees and points to the broadcaster-based ownership of BMI. Moreover, ASCAP cites the rise of the three major networks— ABC, CBS, and NBC—as formidable economic forces on the purchaser's side of the music licensing market, the growth of BMI as a major music licensor, and the unprecedented expansion of the television industry in general, including specifically the unforeseen shift from live to pre-recorded programming, as changed circumstances obviating the need for the mandatory per-program license option contained in the Consent Decree.

I cannot, however, agree with ASCAP that these factors justify the proposed modification at this time when evaluated under the guidelines of *Swift* and *United Shoe*. Putting aside for the moment any issues raised by the source of BMI's owner-ship and by the differences between the ASCAP and BMI consent decrees, the mandatory per-program license option as it currently exists in the Consent Judgment remains consistent with the purposes underlying the decree, even in light of the changed market conditions noted by AS-CAP. Nor can it be said that such a requirement necessarily imposes an undue hardship upon ASCAP or that its ultimate effect on ASCAP will in any way approach the dire prediction of economic downfall that has been put forth.

Although the nature and manner of operation of the television industry may well have changed significantly since the Consent Judgment was entered in 1950, it nevertheless remains that the mandatory per-program option remains an integral part of the injunctive relief provided for by the decree, necessary to provide users with a viable alternative to the blanket license, which has been the subject of repeated antitrust attacks. For instance, in *Broadcast Music Inc. v. CBS, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), the Supreme Court referred to the "real" alternatives to the blanket license available to CBS in holding that the blanket license is not a *per se* violation of the Sherman Act. See *id.* at 11, 24, 99 S.Ct. at 1558, 1564. Consistently, in *Buffalo Broadcasting Co., Inc. v. American Society of Composers, Authors and Publishers*, 546 F.Supp. 274 (S.D.N.Y.1982), appeal pending, No. 83–7058 (2d Cir. argued Nov. 1, 1983), the District Court relied upon the unavailability of, *inter alia*, a practical per-program license option in ruling that blanket licensing by ASCAP to local television stations unreasonably restrains trade in violation of § 1 of the Sherman Act. See *id.* at 288–89, 296. Through the proposed amendment to the Consent Judgment, ASCAP seeks to require each network to make an absolute choice between blanket licensing on one hand and per-program and source licensing on the other; if effective, the proposed amendment would prevent a network from contracting freely for a mixture of these alternatives, which on its face runs counter to the goals of the Consent Decree. None

of the changed circumstances advanced by ASCAP serves, however, to justify this departure in its favor.

Moreover, it is readily apparent that a provision requiring ASCAP always to offer a per-program license quote may serve to foster the goal of competition which underlies this, and presumably all, antitrust injunctions. Assuming as ASCAP does that each network will choose to take only one blanket license, from either ASCAP or BMI, so long as music licensors are required to offer per-program licenses, ASCAP and BMI will presumably compete fiercely to become the organization providing the blanket license. Obviously a blanket license ensures the licensing organization of a substantial, fixed cash payment rather than making the organization's income dependent upon the level of a network's actual use of its licensed music. In addition, there can be no disputing the intuitive accuracy of ASCAP's observation that a network which holds a blanket license from one organization and a per-program license from the other has an economic incentive to favor use in its programs of music covered by the blanket license.[1] This factor thus serves to increase the intensity with which ASCAP and BMI will likely compete for the blanket license.

If, however, ASCAP has no obligation to offer a network a per-program license when that network holds a blanket license from BMI, the network has no assurance in the absence of a blanket license that it will be able to obtain ASCAP source music, and consequently it will be more likely to contract for blanket licenses from both ASCAP and BMI, which is the practice all three networks have followed until now. Any attempt to coerce the networks into blanket licenses is, of course, one of the practices the Consent Judgment is designed to prevent. As noted in both *CBS* and *Buffalo Broadcasting*, it is the existence of these viable alternatives to the blanket license, *inter alia,* that save that

practice from violating the antitrust laws. Contrary to the goals of the Consent Judgment, ASCAP's proposal tends to increase the compulsion of a network to take an ASCAP blanket license and to reduce whatever actual competition may exist between ASCAP and BMI in the pricing of their blanket licenses.

ASCAP's concern that it will be forced to offer its blanket license at an unfairly low price if it has to compete aggressively with BMI is simply unfounded. ASCAP believes that it has a larger and more valuable inventory of songs, but that if compelled to compete directly with BMI for a single blanket license it will be required to cut the price of its more valuable blanket license to meet the price being asked by BMI. The simple answer to this worry is that the market price of any good is determined by the forces of supply and demand. If the networks are not willing to pay more for an ASCAP blanket license than for a BMI license, then the ASCAP license will not have a higher market value than the BMI license, regardless of whether the ASCAP repertory is better or ASCAP itself believes its license should command a higher price. If on the other hand an ASCAP blanket license has some worth to the networks greater than the benefits they will obtain from a BMI license, they will presumably be willing to pay more for the ASCAP license.

Although ASCAP argues that in a free market it would be permitted to withhold its good—a song performance license—from the market if purchasers were not willing to pay the price it was asking, the curtailment of that freedom was one of the prices ASCAP paid when it entered into the Consent Judgment and was allowed to continue with its practice of issuing blanket licenses. While the song licensing market is admittedly far from a perfect market, every increment of competition that can be promoted within the confines of the BMI and ASCAP decrees, which operate to reg-

---

**1.** There is no certainty, however, that in actual practice the networks will be influenced in their actions by this incremental cost, which is appar-

ently minor in comparison to the other costs of television programming.

ulate the market, is desirable from an antitrust standpoint. Recourse to the judicial rate-setting mechanism is not a complete substitute for market forces, but is a process of last resort for those situations where the market participants are unable to reach an accord among themselves. The preference is obviously for market forces to determine the appropriate licensing rates. Thus, I am not persuaded that market conditions place ASCAP in an intolerable position if it is not exempted from the requirement that it offer a per-program license to a network in a situation where the network holds a blanket license from BMI.

Turning to the possible problems created by the differences between the ASCAP and BMI consent decrees and by the sources of BMI's ownership, I have determined that although these two factors raise the potential for a conflict that would justify the amendment proposed by ASCAP, the inequitable results predicted by ASCAP remain far too speculative at this point to warrant immediate action to modify the Consent Decree. Like ASCAP, BMI is subject to the strictures of a consent decree it entered into in 1966 to settle an antitrust suit brought by the Justice Department. *See* Ex.C to Korman Reply Aff. (the "BMI Decree"). As in the Consent Judgment, the BMI Decree mandates that BMI license its repertory on a per-program basis at the request of a broadcaster. Specifically, § VIII(B) of the BMI Decree provides that: "[BMI] shall, upon the request of any unlicensed broadcaster, license the rights publicly to perform its repertory by broadcasting on either a per-program or per programming period basis, at [BMI's] option."

Despite this provision in the BMI Decree, ASCAP argues that networks will nevertheless prefer to take a BMI blanket license and rely upon an ASCAP per-program license, rather than the reverse, because the Consent Judgment provides for judicial determination of a reasonable license rate when ASCAP and a network cannot agree, while the BMI Decree does not. I am not persuaded, however, that the absence of a judicial rate-setting mecha-

nism in the BMI Decree will cause networks to act in this manner adversely to ASCAP's interests. The BMI Decree does specifically mandate that the rates BMI establishes for its various licenses bear a direct relationship to one another so that broadcasters will be afforded a real choice between the different licenses. Another part of § VIII(B) of the BMI Decree provides:

> In the event [BMI] offers to license broadcasters on bases in addition to a per program or per programming period basis, [BMI] shall act in good faith so that there shall be a relationship between such per program or such per programming period basis and such other bases, justifiable by applicable business factors including availability, so that there will be no frustration of the purpose of this section to afford broadcasters alternative bases of license compensation.

Thus, networks are assured by the BMI Decree that they will be able to obtain a BMI per-program license that is priced in relationship to BMI's blanket license; this is all that the judicial resort provision of the Consent Judgment is designed to ensure in the case of the network's dealings with ASCAP. There is no evidence at this point that BMI will fail to act in conformity with its obligations under the BMI Decree, or that the networks will not act in reliance upon the duties the BMI Decree imposes upon BMI. If it appears at a later date that the networks and BMI are not responding in this manner, ASCAP will have a much firmer basis for obtaining the relief it now seeks.

Similarly, although there is some facial appeal to ASCAP's argument based upon the broadcaster-based ownership of BMI, past history indicates that the networks have not acted to favor BMI over ASCAP. The relevant litigation history described in every brief submitted to the Court illustrates a highly adversarial, if not tempestuous, relationship between BMI and the networks. While BMI is indeed broadcaster owned, the networks have not owned any stock in the organization since the late

1950's. Moreover, in connection with the government's antitrust action against BMI which resulted in the entry of the BMI Decree in 1966, the Justice Department investigated and specifically rejected AS-CAP's contention that BMI functions as a special friend to the broadcasters. *See* Ex.A. to NBC Brief. The government accordingly abandoned its call for divesture when it entered into the BMI Decree. *See id.*

Thus, although I share with ASCAP a certain uneasiness over the inherent conflict presented by broadcaster ownership of BMI, actual events have tended to belie this concern and to demonstrate that the conflict is more theoretical than real. If, however, future conduct tends to reflect undue network favoritism toward BMI, my continuing jurisdiction over this matter provides ASCAP with a readily accessible forum in which to renew its modification request. In addition, I would expect that the Department of Justice, in its role as watchdog over the business conduct of both ASCAP and BMI, would reinstitute its call for divestiture of BMI if ASCAP's hypothetical scenario were to begin realization. At the present time, however, I cannot find that the proposed modification is justified.

For the reasons stated above, I find that ASCAP has demonstrated neither changed circumstances nor hardship sufficient under the prevailing legal standard to warrant amendment of the Consent Judgment. However, because I retain continuing jurisdiction over this matter, ASCAP is free to renew its motion at any time if it appears more probable that the consequences AS-CAP has predicted will occur. The motion is denied without prejudice to its renewal on a showing of new circumstances justifying modification of the Consent Judgment. SO ORDERED.