**AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, Appellant,**

v.

**SHOWTIME/THE MOVIE CHANNEL, INC., Applicant–Appellee.**

**No. 1400, Docket 90–6034.**

United States Court of Appeals, Second Circuit.

Argued June 8, 1990.

Decided Aug. 27, 1990.

Jay Topkis, New York City (Simon H. Rifkind, Allan Blumstein, David E. Nachman, Gidon M. Caine, Daniel McNeel Lane, Jr., Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief), for appellant.

R. Bruce Rich, New York City (Kenneth L. Steinthal, Evie C. Goldstein, Jonathan T. Weiss, Weil, Gotshal & Manges, New York City, on the brief), for applicant-appellee.

Before FEINBERG, NEWMAN and CARDAMONE, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

In 1941, the Government settled its antitrust suit against the American Society of Composers, Authors and Publishers (ASCAP) with the entry of a consent decree.[1] As amended in 1950, the consent decree requires ASCAP to offer users of music a so-called "blanket license," the non-exclusive right to perform any music in the

---

**1.** *United States v. ASCAP,* 1940–1943 Trade Cas. ¶ 56,104 (S.D.N.Y.1941).

ASCAP repertory.[2] The amended consent decree also provides that in the event of a dispute concerning the amount of a fee for the blanket license, the District Court for the Southern District of New York is authorized to determine a reasonable fee. This appeal is the first to challenge a fee determination for a blanket license under the ASCAP consent decree.

ASCAP appeals from the October 12, 1989, order of the District Court for the Southern District of New York (Michael H. Dolinger, Magistrate) determining the fee to be paid by the applicant-appellee Showtime/The Movie Channel, Inc. (SMC). Magistrate Dolinger, sitting by consent pursuant to 28 U.S.C. § 636(c) (1988), set the fee for the period April 4, 1984, through December 31, 1988, at 15 cents per subscriber, rejecting ASCAP's request for a fee of 25 cents per subscriber. For substantially the reasons set forth in the Magistrate's comprehensive opinion, reprinted in the appendix to this opinion, we affirm.

### Facts

The background of the blanket license for the right to perform copyrighted music has been set forth in several opinions considering antitrust challenges to its validity. *See Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *Buffalo Broadcasting Co. v. ASCAP,* 744 F.2d 917 (2d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985); *Columbia Broadcasting System, Inc. v. AS-CAP,* 620 F.2d 930 (2d Cir.1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1491, 67 L.Ed.2d 621 (1981). As required by the ASCAP consent decree, ASCAP offers a blanket license for all of the three million songs in its repertory. A substantially similar blanket license is offered by Broadcast Music, Inc. (BMI), the other major organization holding rights to copyrighted music. The BMI repertory includes one million songs.

SMC, the applicant in the pending matter, operates two pay cable television network services, "Showtime" and "The Movie Channel." SMC charges the operators of local cable systems a fee for the right to carry its programming, which consists primarily of movies. Since the films contain copyrighted music, SMC must obtain performance rights for the music on the soundtracks of the films it makes available on its cable channels. Like most users of copyrighted music, SMC finds the blanket license to be the most convenient way to obtain the rights it requires.

*Prior licenses.* SMC's predecessor entities held blanket licenses from ASCAP for the years 1977 through 1979. In these early years of the cable industry, the parties agreed to nominal license fees and stipulated that the licenses were entered into on an "experimental" basis and would not be "prejudicial to any position taken by either of the parties" in the future. The owners of Showtime held a blanket license from BMI for the years 1978–1980, also at nominal fees.

More pertinent to the pending controversy are the licenses in effect in the 1980's. For the period July 1, 1983, through December 31, 1986, SMC obtained a BMI blanket license at a cost of $3.75 million and for the years 1987–1989 at an estimated cost of $2.6 million.[3] For the earlier period, the fee amounted to about 13 cents per subscriber per year, and for the latter period about 12 cents per subscriber per year. For the years 1986–1989, Home Box Office (HBO), another pay cable service, held a BMI blanket license at a cost set at 12 cents per subscriber per year.

For the years 1980–1982, HBO held an ASCAP blanket license at a cost of $6 million and for the years 1983–1985 at a cost of $13 million. Though these fees were set as fixed dollar sums, they amounted to approximately 25 cents per subscriber per year. In December 1985 HBO offered

---

**2.** *United States v. ASCAP,* 1950–51 Trade Cas. ¶ 62,595 (S.D.N.Y.1950).

**3.** The 1987–89 license was obtained from BMI by Viacom International Inc., SMC's parent.

The license covered SMC and other Viacom services. A senior Viacom official estimated that of the total $6.6 million license fee, $2.6 million was allocable to SMC.

to extend its ASCAP license through 1988 for a fee of 24.1 cents per subscriber per year. For the years 1983–1985, the Disney Channel, another pay cable service, held an ASCAP blanket license at a cost of $875,000; this cost amounted to 21 cents per subscriber per year, based on Disney's total year-end subscribers during the period, and 29 cents per subscriber per year, based on the average number of subscribers during the period.

During the years pertinent to this controversy, SMC, HBO, and Disney were the major pay cable services. In 1986, these three services accounted for more than 30 million subscribers, out of a nationwide total of just under 32 million subscribers to all pay cable services.

*The pending license application.* On April 4, 1984, SMC requested from ASCAP a blanket license from that date through 1986.[4] When the parties were unable to agree upon a license fee, SMC, exercising its rights under the Consent Decree, initiated the instant proceeding by asking the District Court to set a "reasonable fee" for the license. Consent Decree, ¶ IX(A).[5] The parties later agreed to extend the fee-setting application to cover the period through 1988. The fee application was heard by Magistrate Dolinger by agreement, 28 U.S.C. § 636(c). The Magistrate conducted a seven-day trial in 1988.

ASCAP contended that a reasonable annual fee for SMC would be 25 cents per subscriber. ASCAP relied on the fees paid by HBO during the years 1980–1985 for an ASCAP blanket license, which were approximately 25 cents per subscriber, and those paid by Disney during the years 1983–1985, which were either 21 or 29 cents per subscriber per year, depending on whether year-end or average subscriber totals are used. ASCAP also relied on HBO's 1985 offer to extend its then existing license at an annual fee of 24.1 cents per subscriber.

SMC contended that the fees paid to ASCAP by HBO and Disney should not provide the basis for a "reasonable fee" to be set for SMC because the HBO and Disney fees reflect ASCAP's monopoly power and are much higher than prices that would obtain in a freely competitive market for copyrighted music rights. Instead, SMC urged the Court to estimate the economic value of the music used by SMC in its programming by analyzing the costs of acquiring other creative components such as script writing and film directing. Using this approach, SMC contended that a reasonable annual fee for the ASCAP blanket license would be 8 cents per subscriber.

*The District Court's decision.* The District Court accepted half of SMC's position, agreeing with SMC that the HBO and Disney fees for ASCAP licenses were not suitable bases for determining a "reasonable" fee for SMC. The Magistrate pointed out that the HBO license for 1980–82 was specified to be "experimental" in nature. He then observed that HBO's 1983–85 license contained a "most favored nation" clause, entitling HBO to a retroactive reduction of its fee to whatever fee might be agreed upon between ASCAP and any pay television service with at least one million subscribers, such as SMC. In the Magistrate's view, if the HBO negotiated fee were to be

---

**4.** After the expiration of its 1977–79 license and prior to April 4, 1984, SMC held no license from ASCAP. That circumstance has resulted in an infringement suit, which is pending in the Southern District. *David v. Showtime/The Movie Channel, Inc.*, 697 F.Supp. 752 (S.D.N.Y. 1988). In the instant fee litigation, SMC asked the District Court to set a fee retroactively for the three-year period preceding April 4, 1984; the District Court dismissed this aspect of SMC's application, ruling that the Consent Decree did not authorize retroactive fee setting.

**5.** Paragraph IX(A) of the Consent Decree provides as follows:

> Defendant ASCAP shall, upon receipt of a written application for a license for the right of public performance of any, some or all of the compositions in the ASCAP repertory, advise the applicant in writing of the fee which it deems reasonable for the license requested. If the parties are unable to agree upon a reasonable fee within sixty (60) days from the date when such application is received by ASCAP, the applicant may forthwith apply to this Court for the determination of a reasonable fee.... In any such proceeding the burden of proof shall be on ASCAP to establish the reasonableness of the fee requested by it....

used as a benchmark for SMC's fee, it would have to be discounted by some value attributable to the benefit of this clause, a reduction that he concluded would be entirely speculative on the record before him.

The Magistrate also rejected the rate of 25 cents per subscriber per year derived from the HBO fees for 1983–85 because HBO had agreed to a flat dollar amount and had done so based on projections of larger numbers of subscribers than it obtained. He pointed out that with the high subscriber projections at hand, it was doubtful that HBO would have agreed in 1983 to pay at a rate that turned out to be 25 cents per subscriber, based on the actual number of subscribers. He also found unpersuasive the rate of 24.1 cents per subscriber offered by HBO in 1985 to extend its license because this offer included the "most favored nation" clause from the 1983–85 license and therefore was not an unconditional offer to pay that rate.[6]

The Magistrate also rejected the Disney license rate as an appropriate benchmark because this rate was agreed to at an early stage of the Disney Channel's existence and reflected considerations not pertinent to arm's length bargaining between AS-CAP and an established cable service like SMC.[7]

Overshadowing these specific grounds for rejecting the pertinence of the HBO and Disney license rates, however, was the Magistrate's basic conclusion that AS-

CAP's bargaining power in negotiating rates for its blanket license was unduly enhanced by the absence of a truly competitive market for copyrighted music or, at a minimum, that the licensees' perception of ASCAP's undue market power prompted them to pay fees higher than those that would obtain in a more competitive market. In support of his view concerning the actuality and the perception of ASCAP's enhanced market power, the Magistrate relied on several factors. These included the necessity of obtaining music rights in order to offer local cable systems films containing copyrighted music; the difficulties SMC would likely encounter in obtaining music rights by alternatives to the blanket license such as per-program licenses (a license from ASCAP to use all of the music in the ASCAP repertory that is needed for performance of a single program); direct licensing (a license from the composer or other copyright proprietor of each song to be performed), or source licensing (a license from the producer of a program for the music contained in that program); and the aversion of those needing music licenses to invoke the heretofore unused rate-setting authority of the District Court. The Magistrate also placed considerable reliance on the fact that the BMI blanket license, which commanded prices only slightly below those for the ASCAP blanket license in other segments of the entertainment industry,[8] was obtained by SMC

---

6. In view of our disposition of this appeal, we need not consider SMC's contentions that the HBO offer to extend its 1985 license was an offer to compromise a disputed claim within the meaning of Fed.R.Evid. 408 and that the offer was inadmissible against ASCAP.

7. As a further basis for rejecting the significance of the Disney license rate, the Magistrate observed that the Walt Disney Music Company owns the rights to much of the music in the ASCAP repertory. This enables the Disney organization to recoup a portion of the ASCAP fee paid by the Disney channel in the form of royalties distributed by ASCAP to the Disney Music Company for Disney music played on the Disney Channel. In the Magistrate's view, this circumstance undermined the worth of the Disney license rate as a benchmark.

   Though we uphold the Magistrate's ultimate rate determination for SMC and his subsidiary conclusion rejecting the pertinence of the Dis-

ney license rate, we do not agree that the recoupment argument is valid. As ASCAP points out, whatever portion of music played on the Disney Channel is owned by the Disney organization simply reduces the amount of music for which the Disney Channel is paying a license fee to ASCAP. For example, if the Disney-owned share is 28 percent, as the evidence suggests, and the Disney organization is therefore recouping 28 percent of its fee in royalties, the Disney Channel would be paying 72 percent of its fee to obtain 72 percent of the music it needs. The full fee would nonetheless represent the cost of acquiring 100 percent of the music performed.

8. The ratio of prices for the ASCAP and BMI blanket licenses obtained by the national television networks is 1.18 to 1, for local television stations, 1.43 to 1, for local radio stations, 1.16 to 1, and for the MTV cable network, virtually equal.

and HBO at prices between 12 and 13 cents per subscriber, far below ASCAP's claimed price of 25 cents.

Having concluded that ASCAP had not sustained its burden of proving that its claimed price was reasonable, the Magistrate turned to the task of setting a reasonable fee. He rejected SMC's suggested price of 8 cents per subscriber,[9] and instead determined that a reasonable price would be 15 cents per subscriber. The Magistrate started his calculation by using the price of approximately 12 cents per subscriber paid by SMC and HBO for the BMI blanket license. He rejected SMC's objection that the price for the BMI blanket license reflected a degree of undue market power similar to that of ASCAP, doubting that BMI "has or chooses to exert the type of leverage that SMC attributes to it." Appendix, infra, at 595. The Magistrate then adjusted the BMI rate upward by a factor reflecting the 55–45 ratio that ASCAP and BMI had agreed to use in splitting the amount determined by the Copyright Tribunal to be payable to both organizations out of the royalties for compulsory licenses paid by cable system operators for program retransmissions.[10] See 17 U.S.C. § 111(d) (1988). Though recognizing that the ASCAP repertory contains three times as many songs as the BMI repertory, he concluded that the value of the ASCAP license only slightly exceeded that of the BMI license and that the difference was best reflected by the agreement between ASCAP and BMI respecting the Copyright Tribunal payments. He specifically declined to credit ASCAP's claim that programs carried on SMC channels use twice as much ASCAP music as BMI music. Based on the adjusted BMI rate, the Magistrate set a fee of 15 cents per subscriber for the ASCAP blanket license.

### Discussion

On appeal ASCAP contends that the Magistrate erred in not setting a fee at 25 cents per subscriber. In ASCAP's view, the Magistrate was required to consider as the most relevant comparable transactions the ASCAP blanket licenses to HBO and Disney for 1983–85, and erred in rejecting the pertinence of these transactions in favor of the BMI blanket licenses to HBO and SMC. ASCAP also contends that even if the BMI blanket licenses are pertinent, the Magistrate erred in not making a higher adjustment for ASCAP from the BMI license fee. SMC, not pressing its trial court claim of a fee of 8 cents per subscrib-

9. SMC had arrived at the 8-cent price by endeavoring to determine the value of the music it sought to use, compared to the value of other artistic components of films, such as script writing and directing. Its methodology was to start with the payment of residuals received by members of the Screenwriters Guild and the Directors Guild of America pursuant to the collective bargaining agreement of these organizations. This payment is 1.2 percent of the amount paid by the pay cable television service to the film distributor. The 1.2 percent was discounted by 75 percent, allegedly reflecting the fact that "up front" costs incurred by producers of films shown on SMC's channels for acquisition of musical services averaged 25 percent of the comparable costs for writing and directing services. The discounted percentage of residual payments amounts to 8 cents per subscriber.

The Magistrate rejected this methodology because (1) the 1.2 percent rate was only one term of a complex collective bargaining agreement and would not necessarily represent the value of the screen writing and directing services if only the price of these services were bargained for, (2) the sample of films for which the "up front" payments were obtained was too small to provide an acceptable sampling error, and the films selected were not shown to be representative of films shown on SMC channels, (3) use of the uniform 1.2 percent rate for screen writing and directing services as a base against which to compare music services was rendered suspect by the wide variation in "up front" payments for the former services, and (4) at best, the methodology valued the music rights alone, without attributing any value to the convenience of acquiring rights to all music in the ASCAP repertory by use of the blanket license.

10. In 1980, the Copyright Tribunal, acting pursuant to 17 U.S.C. § 111(d)(5), determined that music performing rights societies should receive 4.5 percent of the compulsory license royalties and that this sum should be distributed 54 percent to ASCAP, 43 percent to BMI, and 3 percent to a third organization known as SESAC. See Copyright Royalty Tribunal, *1978 Cable Royalty Distribution*, 45 Fed.Reg. 63026, 63040, 63041 (Sept. 23, 1980). For subsequent years ASCAP and BMI agreed to share the fees awarded to them by the Copyright Tribunal in a ratio of 55(ASCAP)–45(BMI).

er, is content to defend the Magistrate's fee of 15 cents per subscriber.

The parties also differ in their approach to the appropriate standard of review. AS-CAP declines to specify a standard of review, simply contending that the Magistrate has erred in rejecting the 25 cent rate, in rejecting the pertinence of the AS-CAP licenses to HBO and Disney, in relying on the BMI licenses to HBO and SMC, and in calculating the adjustment to the BMI license rate. SMC contends that each of these aspects of the Magistrate's decision is a finding of fact, subject to review under the "clearly erroneous" standard. Neither side's approach to the standard of review is satisfactory.

■ Fair market value is a factual matter, albeit a hypothetical one. It is the price that a willing buyer and a willing seller would agree to in an arm's length transaction. That the value to be determined is hypothetical does not render it any the less a matter of fact, for purposes of the standard of review. Fact-finders frequently are obliged to determine as a matter of fact hypothetical values pertinent to damage calculations. *See, e.g., Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946) (lost profits); *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931) (same). But the factual component of the issue before the Magistrate does not render all aspects of his decision-making subject to review under the "clearly erroneous" standard. In making a factual determination, a decision-maker might rely on legally impermissible factors, fail to give consideration to legally relevant factors, apply incorrect legal standards, or misapply correct legal standards. In jury trials, such matters are normally resolved by rulings on admissibility of evidence and by jury instructions. In court trials, where the functions of fact-finding

and exposition of law are performed by the same person, the line between the functions is not always distinct. For example, the line between admissibility of evidence (law) and evaluation of the persuasive force of evidence (fact) is often blurred. Nevertheless, an appellate court is obliged to observe the law/fact distinction as best it can and accord plenary review to any aspect of a trial court's decision that can fairly be isolated as determining an issue of law.[11] With that principle in mind, we consider the various steps in the Magistrate's decision-making process in this case.

■ The Magistrate's first step, and the one most vigorously challenged by AS-CAP, was the refusal to regard the HBO and Disney blanket licenses from ASCAP as the most pertinent transactions for determining a reasonable fee for an ASCAP blanket license to SMC. Recognizing the general utility of comparable sales in determining the fair value of property, the Magistrate concluded that HBO had paid a price higher than fair value because of ASCAP's undue market power in the field of licensing music rights, *i.e.,* a price higher than would have obtained if there existed a freely competitive market for music rights or at least a market more competitive than the one currently functioning. There are factual and legal components to that conclusion. Whether a market is freely competitive and, if not, whether a particular seller enjoys more market power than would obtain in a freely competitive market are matters of fact, albeit not as easy to ascertain nor as free from dispute as amounts of gross sales or net profits. Like many matters of fact, the competitiveness of a market and the market power of a seller may be ascertained with the aid of expert opinions, whose persuasive force is itself a factual matter within the purview of the fact-finder. On the other hand, whether the price paid by a buyer may be

---

**11.** We prefer to consider issues either as matters of fact or of law, avoiding the unhelpful category of "mixed question of law and fact." That phrase usually conceals the existence of both a question of fact and a question of law and does not aid in identifying the appropriate standard of appellate review. *See Antilles Steamship Co.* *v. Members of the American Hull Insurance Syndicate,* 733 F.2d 195, 206 (2d Cir.1984) (Newman, J., concurring); *see also Meyers v. Selznick Co.,* 373 F.2d 218, 222 n. 2 (2d Cir.1966) (Friendly, J.); Bohlen, *Mixed Questions of Law and Fact,* 72 Univ.Pa.L.Rev. 113 (1924).

given less weight as a "comparable sale" either because the price was higher than would have obtained in a more competitive market or was perceived by the buyer to be higher is a matter of law. In a jury trial, this question would have arisen as an objection to evidence of the competitive nature of the market and the buyer's perception of the market.

■ The Magistrate's view that the market for licensing music rights is not freely competitive finds support in the evidence. Though SMC's expert economist may have indulged in some hyperbole in stating that ASCAP operates in "as close to a perfect monopolistic market that I have ever seen," his view, even if discounted, was entitled to be relied upon. The evidence disclosed that in the licensing of music rights, songs do not compete against each other on the basis of price. Though it is theoretically possible for a licensee to obtain music rights to particular songs by negotiating with the composer or the producer of a film, the record is clear that this is not occurring, that cable channels need access to the ASCAP and BMI repertories to supply films to cable systems, and that the blanket license is the existing method for obtaining the needed rights. The Magistrate was entitled to find that the market is less competitive than it would be if direct or source licensing were regularly used or if music rights were scattered among numerous performing rights societies with users free to secure only those licenses needed to distribute particular films. And he was entitled to find that ASCAP's dominant position in the music licensing field gives it considerable market power.

ASCAP contends that the findings about the market and ASCAP's market power cannot stand (are clearly erroneous) in light of this Court's decisions in the *CBS* and *Buffalo Broadcasting* cases. We there ruled that antitrust plaintiffs had not sustained their burden of proving that the blanket license functioned to restrain trade, a burden they were obliged to discharge in order to impose treble damage liability upon ASCAP for an alleged violation of section 1 of the Sherman Act, 15 U.S.C. § 1

(1988). But the failure of those antitrust plaintiffs to prove an antitrust violation does not mean that the Magistrate lacked evidence sufficient to support a finding that ASCAP enjoys more market power than it would have in a freely competitive market for music rights.

■ Nor did the Magistrate commit legal error in regarding ASCAP's market power as a relevant consideration in diminishing the weight of the ASCAP licenses to HBO and Disney as comparable sales. The rate court was established as a component of the settlement of the Government's antitrust challenge to ASCAP's licensing practices. Though the rate court's existence does not mean that ASCAP has violated the antitrust law, the court need not conduct itself without regard to the context in which it was created. The opportunity of users of music rights to resort to the rate court whenever they apprehend that ASCAP's market power may subject them to unreasonably high fees would have little meaning if that court were obliged to set a "reasonable" fee solely or even primarily on the basis of the fees ASCAP had successfully obtained from other users. The Ninth Circuit has observed that "as a potential combination in restraint of trade, ASCAP has been 'disinfected' by the [consent] decree." *K–91, Inc. v. Gershwin Publishing Corp.*, 372 F.2d 1, 4 (9th Cir. 1967), *cert. denied*, 389 U.S. 1045, 88 S.Ct. 761, 19 L.Ed.2d 838 (1968). The disinfectant need not be a placebo.

■ It is a slightly closer question whether the Magistrate properly relied on HBO's *perception* that ASCAP enjoyed undue market power in agreeing to the rate for HBO's license. As ASCAP points out, courts do not permit psychoanalysis of buyers in comparable transactions to explore the complex mental processes that affected their decision finally to agree on a price. Yet we are not so sure that buyer motivation is never relevant to the weight of what is alleged to be a comparable sale. Suppose, for example, that in valuing a tract of land the selling prices of five lots of similar size and location were presented, one of which was significantly higher than the

average of the other four. We are not prepared to say that it would not be relevant to show that the buyer of the fifth lot mistakenly believed that there was oil under that lot.[12] However that may be, it was not error for the Magistrate to receive and weigh evidence that HBO thought it was paying a high price for the blanket license but was willing to do so because it felt it had no choice.

■ Ultimately, the Magistrate weighed all of the evidence and found, as a matter of fact, that ASCAP had not sustained its burden of proving that its price of 25 cents per subscriber was reasonable. No legal error contributed to that finding, and the finding itself, adequately supported by the record, is not clearly erroneous.

Having determined that ASCAP's price was not reasonable, the Magistrate was then obliged to determine a price that was reasonable. ASCAP faults this phase of the decision in two respects, first, the use of the BMI license to SMC as a starting point for the determination, and, second, the degree of adjustment from the price of the BMI license.

In determining that the BMI license to SMC was sufficiently comparable to provide guidance toward a reasonable rate for an ASCAP license, the Magistrate was making factual findings and, in effect, a legal conclusion. The circumstances concerning the BMI license, *e.g.*, the number of songs in the BMI repertory, the extent to which SMC uses BMI music, and the amount of dollars paid for the BMI license, were matters of fact. Only the relative use of BMI music compared to ASCAP music was in dispute. ASCAP contended that SMC uses twice as much ASCAP music as BMI music. This claim was based on ASCAP data purporting to count "needle-

drops," instances where music in the ASCAP reportory is played on an SMC program, regardless of the duration of each "play." The Magistrate found that ASCAP's data on this point was "subject to methodological question," Appendix, infra, at 596 n. 49, surely a matter for factual assessment. It was also a factual matter for the Magistrate to deem more pertinent the fact that SMC needs both the ASCAP and the BMI blanket licenses and that BMI "provides a service comparable to that of ASCAP." Appendix, infra, at 594. All of the factual findings relating to the comparability of the ASCAP and BMI licenses have adequate support in the record.

Based on these factual determinations, the Magistrate, in effect, drew the legal conclusion that SMC's BMI license was a "comparable" license, a determination analogous to an evidentiary ruling that would have occurred if the price of the BMI license had been offered at a jury trial. The factors bearing on the comparability of the BMI license placed it well within the degree of latitude enjoyed by a trial judge in ruling on the admissibility of such evidence.

The Magistrate's final step, adjusting the BMI price by the 55–45 ratio ASCAP had negotiated with BMI for allocation of cable retransmission royalties awarded by the Copyright Tribunal, was a factual determination fully supported by the record. The appropriateness of the 55–45 ratio was confirmed by the similar ratios of rates for ASCAP and BMI licenses in other segments of the broadcasting industry.

Magistrate Dolinger performed the rate-setting task conscientiously, thoroughly, and fairly. The judgment of the District Court is affirmed.

---

**12.** Among the factors that have been thought relevant in determining that a sale of other property was not comparable to real estate being valued for condemnation are that the transaction was a forced sale, 1 L. Orgel, *Valuation Under the Law of Eminent Domain* § 22 (2d ed. 1953), that the price was artificially high due to the special needs of the buyer, *id.* § 23, and that the price reflected market conditions that have

since changed, *id.* § 139, at 591, although court assessment of these factors has not been uniform. It has also been thought relevant to valuation to admit evidence that land thought to be valuable at the time of condemnation was not valuable at the time of trial and that land thought to be of low value at the time of condemnation was very valuable at the time of trial. *Id.* § 27, at 133.

APPENDIX

United States District Court, Southern District of New York.

United States of America, Plaintiff,

v.

American Society of Composers, Authors and Publishers, Defendants.

In The Matter of the Application of Showtime/The Movie Channel, Inc., Applicant.

For A License for Its Pay Television Services.

Civ. 13–95 (WCC)

MICHAEL H. DOLINGER,

UNITED STATES MAGISTRATE:

## ORDER

Since applicant Showtime/The Movie Channel, Inc. has withdrawn its request for determination of a per-program license fee for the period April 4, 1984 through December 31, 1988 (*see* Stipulation and Order dated December 18, 1989), this proceeding is deemed to have been completed in accordance with the terms specified in this Court's Memorandum and Order dated October 12, 1989 at pages 1 to 69 and 72 to 73.

DATED: New York, New York

December 20, 1989

SO ORDERED.

/s/ Michael H. Dolinger
MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE

Copies of the foregoing Order have been transmitted this date to:

Allan Blumstein, David E. Nachman, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for American Society of Composers, Authors and Publishers.

R. Bruce Rich, Kenneth L. Steinthal, Evie C. Goldstein, Weil, Gotshal & Manges, New York City, for Showtime/The Movie Channel, Inc.

United States District Court, Southern District of New York.

United States of America, Plaintiff,

v.

American Society of Composers, Authors and Publishers, Defendants.

In the Matter of the Application of Showtime/The Movie Channel, Inc., Applicant.

For A License for Its Pay Television Services.

Civ. 13–95 (WCC)

Originally filed under Seal on Oct. 12, 1989.

Subsequently unsealed when it went up on appeal.

MICHAEL H. DOLINGER, UNITED STATES MAGISTRATE:

## MEMORANDUM AND ORDER

Showtime/The Movie Channel, Inc. ("SMC") has applied to this Court pursuant to Article IX(A) of the Amended Consent Decree for an order setting a reasonable fee for a "blanket" license from the American Society of Composers, Authors and Publishers ("ASCAP") for the period from April 4, 1984 through December 31, 1988. SMC also seeks an order declaring that it is entitled to a so-called "per program" license from ASCAP under Article VII(B) of the Decree.

For the reasons that follow, the fee for the blanket license for the period in question is set at $0.15 per subscriber. With respect to the per-program license question, since ASCAP has represented that it is willing to negotiate a fee for such a license, there is no current controversy that requires resolution of the meaning of the Decree. Accordingly, the parties are to attempt for a period of twenty-one (21) days to resolve by negotiation the amount of any such fee, at which time SMC may return to the Court under Article IX(A).

## A. Background

As noted in prior decisions in this proceeding, the jurisdiction of this so-called "rate" court is an artifact of a consent decree negotiated between the United States Department of Justice and ASCAP to settle an antitrust lawsuit commenced by the Government to challenge various practices of ASCAP in the licensing of the copyrighted music of ASCAP's members. As amended in 1950, the decree requires ASCAP to make available on request a license for the public performance of its music. (Consent Decree, Article V.)[1] In addition to the traditional blanket license—which makes the entire ASCAP repertory available for unlimited use during the license period, in exchange for a specified payment—the decree requires ASCAP to offer to "radio and television broadcasters" a so-called "per program license," which exacts a fee for each designated program. (Article VII(B).)

The Consent Decree further provides that the parties are to attempt, in the first instance, to negotiate a mutually acceptable fee for the license and, failing that, either party may, after sixty days, apply to this Court to set a "reasonable fee." (Article IX(A).) The Decree does not attempt to define the term "reasonable fee" and thus apparently leaves to the Court broad discretion to fashion an appropriate methodology for deriving such a rate.

Article IX(B) of the Decree also permits the Court to set an interim fee upon application by either party. That fee is to govern during the period when the parties either negotiate a final fee or litigate its terms before the rate court. The interim fee, however, is subject to retroactive modification to conform to the final fee that is either agreed to or imposed by court order.

In this case, SMC served on ASCAP on April 4, 1984 a request for a license for both the preceding period from April 4, 1981 to April 3, 1984 and for the period from April 4, 1984 forward to December 31, 1986. When negotiations failed SMC filed an application with the Court seeking a determination of fees for the same time period. By Memorandum and Order dated July 8, 1986, the Court dismissed SMC's application insofar as it sought relief for the three-year period prior to April 4, 1984 since the Consent Decree did not authorize such retroactive fee setting. Subsequently the parties agreed to modify SMC's fee application to encompass an additional two-year period, ending December 31, 1988. (*See* Joint Pre-trial Statement ("JPS") at ¶ 3, n. 2.)

During the pendency of this proceeding, ASCAP applied for the award of interim fees. By Memorandum and Order dated October 15, 1984, the Court ordered that SMC commence paying provisional fees in the amount of $90,000.00 per month. Thereafter, based upon a fuller written record, the Court ordered SMC to pay interim fees for a blanket license in the same amount. (*See* Memorandum and Order dated January 14, 1985.) That interim fee has been in place since January 14, 1985.

Finally, since the parties' episodic efforts at settlement proved unavailing, the Court conducted a seven-day trial in January 1988. Post-trial briefing followed in March 1988.

## B. The Parties and their Relationship

ASCAP is an unincorporated membership association consisting of approximately 40,000 composers and music publishers, who rely upon it to license the performing rights in their copyrighted musical compositions. (JPS at ¶ 2.)[2] ASCAP serves as both the licensing agent and the collector and distributor of royalties for licensed performances. Its repertory includes more than three million compositions. *See Buf-*

---

1. The Consent Decree is reproduced in *United States v. ASCAP*, 1950–1951 Trade Cases (CCH) ¶ 62,595 (S.D.N.Y. March 14, 1950).

2. Under the terms of the Consent Decree, ASCAP can serve only as a non-exclusive agent for its members, thus reserving to the members the option of directly licensing their compositions if they so choose. (*See* Consent Decree Article IV(B).) As a practical matter, users of music in the television industry have generally dealt with ASCAP rather than seeking some form of direct licensing.

*falo Broadcasting Co. v. ASCAP*, 744 F.2d 917, 920 (2d Cir.1984), *cert. denied*, 469 U.S. 1211 [105 S.Ct. 1181, 84 L.Ed.2d 329] (1985).[3]

SMC is in the business of acquiring, producing, marketing and transmitting programs through pay-cable television channels. It operates principally two pay cable services, known as Showtime and The Movie Channel.[4] (JPS at ¶ 1.) For the most part, the programs of SMC consist of made-for-theatre movies; a smaller portion consist of general entertainment programs. (JPS at ¶¶ 11–12.) The programs acquired or produced by SMC are transmitted to viewers through cable television system operators, who charge willing subscribers a monthly fee for access to each of the SMC services, and pass along a portion of that fee to SMC. (JPS at ¶¶ 1, 7.)

SMC and its predecessor entities have a very limited history of fee negotiations and agreements with ASCAP. In 1979 both Showtime and The Star Channel—the predecessors of SMC[5]—entered into licensing agreements with ASCAP for the period from January 1, 1977 through December 31, 1979. (*See* Memorandum and Order Dated January 14, 1985, at 5; JPS at ¶¶ 26, 27.) Under the Showtime agreement, no fee was payable for 1977, and for the next two years Showtime was to pay $12,500.00 and $52,500.00 respectively. (*Id.*) The agreement for Star Channel provided for no payment for 1977, and payments of $6,000.00 and $9,000.00 for 1978 and 1979. (*Id.*) Both agreements contained an identical provision specifying that they were

being entered into on an experimental and non-prejudicial basis, shall apply for the term of this agreement only, and shall not be binding upon or prejudicial to any position taken by either of the parties for any period subsequent to the termination of the agreement.

(Joint Exhs. 2 & 3 at ¶ 1(c).)

For the period from 1980 to April 1984, neither SMC nor its predecessors held any ASCAP license. *See David v. Showtime/The Movie Channel*, 697 F.Supp. 752, 754 (S.D.N.Y.1988); Deposition of Benson Begun at 9–15; Deposition of Michael Gerber at 23–24.[6] This state of affairs apparently resulted from an initial inability to reach agreement and then an abortive effort by ASCAP to seek royalty payments directly from the cable system operators rather than from the pay cable programming services. *See* Gerber Dep. at 32–38; *David v. Showtime/The Movie Channel, supra*, 697 F.Supp. at 754. When this attempt was abandoned and the parties were again unable to reach agreement, SMC formally requested a license from ASCAP on April 4, 1984.

### C. *The Positions of the Parties*

In valuing the blanket license under which SMC now operates, the parties have offered strikingly different approaches. ASCAP urges that a "reasonable" fee is best judged by a comparison with fees agreed to either between the same parties or between comparably situated parties if the agreements were reached in "arms length" negotiations. Since the parties in this proceeding have no meaningful record

---

**3.** For historical background concerning the formation of ASCAP and its role in the protection of composers' property interest in their music, *see* Sobel, "The Music Business and the Sherman Act: An Analysis of the 'Economic Realities' of Blanket Licensing," 3 Loyola Ent.L.J. 1, 2–3 (1983). *See also* Finkelstein, "The Composer and the Public Interest—Regulation of Performing Rights Societies," 19 Law & Contemp. Prob. 275 (1954).

**4.** Since 1986 SMC has also operated a "pay per view" service named Viewer's Choice. (JPS at ¶ 2.)

**5.** SMC was formed in 1983 as a joint venture of Viacom, Inc. and Warner Communications, Inc.

Those companies had previously separately operated services known, respectively, as Showtime and The Movie Channel (originally called the Star Channel). Showtime began operation as a subsidiary of Viacom in July 1976 and The Movie Channel, in its prior incarnation as the Star Channel, commenced operations as a subsidiary of Warner, in February 1973. (*See* Memorandum and Order dated January 14, 1985, at 4.)

**6.** The deposition of Mr. Begun was received in evidence as ASCAP Exh. 21. The deposition of Mr. Gerber was received as SMC Exh. U.

of prior dealings—the early "experimental" rates having concededly reflected the nascent status of Showtime and the Star Channel in the late 1970's—ASCAP would have the Court look to its course of dealings with SMC's principal current competitor in the pay cable television market, Home Box Office, Inc. ("HBO"). Citing its agreements with HBO for the 1980–to–1982 period and its subsequent agreement with HBO for 1983 to 1985, ASCAP argues that those deals involved annual payments that ultimately approximated $0.25 per HBO subscriber. ASCAP also invokes the fact that on December 17, 1985 HBO offered, in effect, to extend its prior agreement on the basis of an annual payment representing $0.24.1 per subscriber. According to AS-CAP, the willingness of HBO to accept these fee levels in "arms length" negotiations should govern here since HBO is comparable to SMC in its market position and its use of music on its programming. Indeed, HBO not only offers programming very similar to that of SMC, but is its principal competitor.

Based on these comparisons, ASCAP seeks a fee of $0.25 per subscriber. In further support of this position ASCAP cites its license agreement with the Disney Channel for the period from April 18, 1983 through the end of 1985. Although this agreement, like the HBO contracts, called for lump sum payments, ASCAP calculates that, based on Disney's subscriber levels, those fees in effect amounted to payments of between $0.21 and $0.29 per subscriber.[7]

SMC frontally attacks the proposed reliance on any prior ASCAP agreements principally because, in its view, ASCAP is a classical monopolist and is thus able to extract prices well above the levels that would be set in a freely competitive market. In place of the HBO and Disney analogies, SMC offers a mode of analysis that attempts to assign an economic value to the music used by SMC in its programming. To do this SMC looks to the cost of

acquiring other creative elements of such programming, specifically scriptwriting and directorial services. Based on this approach, SMC suggests that a generous valuation of the benefits that it receives under the ASCAP blanket license would permit an award of no more than $0.08 per subscriber.

With respect to the per-program license question, ASCAP argues that because SMC is a cable program supplier, it is not entitled to a per-program license under the terms of Article VII(B) of the Consent Decree. It also argues that SMC should not be permitted at this stage to press for such a license because it has never manifested any interest in obtaining one. Predictably, SMC disagrees with both of these contentions and seeks an order directing ASCAP to make such a license available.

## ANALYSIS

### I. *The Blanket License Question*

#### A. General Standards

The Consent Decree provides very limited guidance as to the criteria by which royalty fees are to be established. Indeed, it refers only to the setting of a "reasonable fee," without further defining the term.

As a general matter consent decrees are to be read in accordance with their "plain meaning" or "explicit language." *See, e.g., United States v. Atlantic Refining Co.,* 360 U.S. 19, 22–23 [79 S.Ct. 944, 946, 3 L.Ed.2d 1054] (1959); *Berger v. Heckler,* 771 F.2d 1556, 1568 (2d Cir.1985); *Artvale, Inc. v. Rugby Fabrics Corp.,* 303 F.2d 283, 284 (2d Cir.1962) (*per curiam*); *cf. Schurr v. Austin Galleries of Illinois, Inc.,* 719 F.2d 571, 577 (2d Cir.1983) (Van Graafeiland, J., concurring). This emphasis on interpreting the decree within its "four corners" is based on the notion that the decree "represents a compromise between parties who have waived their right to litigation and, in the interest of avoiding the risk and expense of suit, have 'give[n] up something they might have won had they proceeded

---

7. The variation between $0.21 and $0.29 reflects two different measures of subscribers, year-end and total average subscribers.

with the litigation....'" *Berger v. Heckler, supra,* 771 F.2d at 1568 (*quoting United States v. Armour & Co.,* 402 U.S. 673, 681 [91 S.Ct. 1752, 1757, 29 L.Ed.2d 256] (1971)). Accordingly, we are cautioned, "the scope of the consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 574 [104 S.Ct. 2576, 2585, 81 L.Ed.2d 483] (1984); *SEC v. Levine,* Dkt. Nos. 88–6294, 6296, 6298, 6300, 6302, 6304, slip op. 4887, 4916–17 [881 F.2d 1165, 1178–79] (2d Cir. Aug. 2, 1989); *Berger v. Heckler, supra,* 771 F.2d at 1568.

Nonetheless, as is the case with contracts, if the terms of a decree are not self-explanatory, the court may look to contextual indicia of meaning. *See, e.g., United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238 [95 S.Ct. 926, 935, 43 L.Ed.2d 148] (1975); *SEC v. Levine, supra,* slip op. at 4917 [at 1179] (citing *Schurr v. Austin Galleries of Illinois, Inc., supra,* 719 F.2d at 575). *See also United States v. American Cyanamid Co.,* 719 F.2d 558, 564 (2d Cir.1983). That is surely necessary here, since the key term "reasonable fee" is not defined and does not have an explicitly accepted meaning.

In prior interim fee decisions in this and related proceedings, this Court has indicated that the appropriate analysis ordinarily seeks to define a rate or range of rates that approximates the rates that would be set in a competitive market. *See, e.g., In re Buffalo Broadcasting Co.,* Memorandum & Order at 9–11 (S.D.N.Y. Feb. 17, 1987). This conclusion is based in large measure on the perception that the rate-setting mechanism defined by the decree was designed to address potential pricing problems in a market that is concededly not freely competitive. *See, e.g., U.S. v. AS-CAP,* 586 F.Supp. 727, 728, 730 (S.D.N.Y. 1984); Deposition of Dr. Paul Fagan at 35 [8]; Tr. 114–15; Sobel, *supra,* 3 Loyola Ent.L.J. at 33–34. *See also* Cirace, "*CBS v. ASCAP:* An Economic Analysis of a

Political Problem", 47 Ford.L.Rev. 277, 303–04 (1978); Finkelstein, *supra,* 19 Law & Contemp.Probs. at 288. Indeed, the courts have repeatedly acknowledged that the rate court not only functions as an alternative source of pricing for public performance licenses in the event that the would-be licensee and ASCAP are unable to reach agreement in direct negotiations, *see, e.g., K–91, Inc. v. Gershwin Pub. Corp.,* 372 F.2d 1, 4 (9th Cir.1967), *cert. denied,* 389 U.S. 1045 [88 S.Ct. 761, 19 L.Ed.2d 838] (1968), but also serves to minimize the likelihood that ASCAP's evident market leverage may be exerted to obtain unacceptably inflated price levels for its licenses. *See, e.g., Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 24 [99 S.Ct. 1551, 1564, 60 L.Ed.2d 1] (1979); *Buffalo Broadcasting Co. v. ASCAP,* 744 F.2d 917, 923 (2d Cir.1984), *cert. denied,* 469 U.S. 1211 [105 S.Ct. 1181, 84 L.Ed.2d 329] (1985).

Notwithstanding the primacy of these concerns, it is appropriate to note certain caveats with respect to the specific application of this general policy. These indicate that restraining ASCAP's pricing is not necessarily the only relevant consideration and that even that goal does not dictate a search for the perfectly competitive market price.

As a general matter a consent decree may fairly be interpreted with an eye to the policies of the statute under which the Court approves the decree. *See, e.g., United States v. American Cyanamid, supra,* 719 F.2d at 564. Nonetheless, as previously noted, the Supreme Court has cautioned against the assumption that a consent decree has, as its central purpose, the alleviation of a problem that was only alleged, and not proven, by the plaintiff in the underlying case. *See, e.g., Firefighters Local Union No. 1784 v. Stotts, supra,* 467 U.S. at 574 [104 S.Ct. at 2585]; *United States v. Armour & Co., supra,* 402 U.S. at 681 [91 S.Ct. at 1757]; *SEC v. Levine, supra,* slip op. at 4916–17 [at 1178–79]; *Berger v. Heckler, supra,* 771 F.2d at 1568. Since the Justice Department chose to settle its

---

**8.** The Fagan Deposition was received as SMC Exh. W.

antitrust suit, the Decree in this case should not be viewed as simply an endorsement of its theory of monopolistic power and conduct by ASCAP.

The very generality of the term "reasonable rate" suggests that in appropriate circumstances the rate court has some discretion to look to considerations beyond simply the policy of encouraging pricing restraint for ASCAP music. The nature of that discretion is at least suggested by the fact that the apparent antecedent for the rate court provision of the Consent Decree was a line of cases in which the courts have ordered antitrust violators to license their patents to all applicants for a "reasonable" royalty. Timberg, "The Antitrust Aspects of Merchandising Modern Music", 19 Law & Contemp.Prob. 294, 308 (1954). *See, e.g.,* 1A R. Callman, *Unfair Competition, Trademarks & Monopolies* § 4.56 at 60 & n. 31 (4th ed. 1981) (citing cases); *Besser Mfg. Co. v. United States,* 343 U.S. 444, 447 [72 S.Ct. 838, 840, 96 L.Ed. 1063] (1952); *International Salt Co. v. United States,* 332 U.S. 392, 398 n. 7 [68 S.Ct. 12, 16 n. 7, 92 L.Ed. 20] (1947). As the analysis in these cases suggests, the principal concern in seeking to determine a reasonable royalty is the policy of encouraging competition in the relevant industry and avoiding inflated pricing resulting from artificial market control. *See, e.g., Int'l Salt Co. v. United States, supra,* 332 U.S. at 401 [68 S.Ct. at 17]; *United States v. Hartford Empire Co.,* 65 F.Supp. 271, 275–76 (N.D.Ohio 1946) (citing cases). Nonetheless, this goal did not lead those courts to attempt to construct a model of a perfectly competitive market, presumably because the antitrust laws do not compel such a pristine form of competition, because other relevant statutes—such as the patent laws—may embody important countervailing policies, and because there is generally no data available to recreate such a hypothetical market.

The same limitations are evident here. Perfect competition is required neither by the antitrust laws nor by the Decree. Moreover, the policies underlying the Copyright Act are at least potentially relevant to the court's analysis, depending of course upon the nature of the evidence adduced. Furthermore, since there is no competitive market in music rights, the parties and the Court lack any economic data that may be readily translated into a measure of competitive pricing for the rights in question. *See, e.g.,* Sobel, *supra,* 3 Loyola Ent.L.J. at 33–34, 41; Cirace, *supra,* 47 Ford.L.Rev. at 277. Of necessity, then, we must look to very imperfect surrogates, particularly agreements reached either by these parties or by others for the purchase of comparable rights. *See, e.g., Amusement & Music Operators Assn. v. Copyright Royalty Tribunal,* 676 F.2d 1144, 1155–57 (7th Cir.), *cert. denied,* 459 U.S. 907 [103 S.Ct. 210, 74 L.Ed.2d 168] (1982); In re *Buffalo Broadcasting Co.,* Memorandum and Order at 12–17 (S.D.N.Y. Feb. 17, 1987); In re *Home Box Office, Inc.,* Memorandum & Order at 4–16 (S.D.N.Y. July 11, 1986); In re *Showtime/The Movie Channel, Inc.,* Opinion and Order at 8–23 (S.D.N.Y. Jan. 14, 1985); In re *American Broadcasting Companies, Inc.,* Findings of Fact & Conclusions of Law at 8 (S.D.N.Y. May 26, 1982). Such an exercise of course requires not only an analysis of comparability, but also consideration of the degree to which the assertedly analogous market under examination reflects an adequate degree of competition to justify reliance on agreements that it has spawned.

Bearing these general standards in mind, I turn to the specific disputes in this case. As will be seen, the parties have not sought to inject into this proceeding any policies other than the need for setting a fee that reasonably approximates a competitive market rate. (*E.g.,* Tr. 107) (ASCAP views "arm length" negotiated agreements as indicators of competitive market rates.) Rather, the core of the controversy involves disagreements as to the adequacy of each side's chosen surrogates, as well as an implicit disagreement as to the nature of the rights that must be priced.

## B. The HBO & Disney Rates

ASCAP relies principally upon a variation of the rates agreed to by HBO for the

1980–to–1982 and the 1983–to–1985 periods. Both of these sets of agreements involved payments of a flat sum, but if calculated on a per-subscriber basis, the 1980–82 fees amounted to either $0.20 or $0.24 and the 1983–85 fees amounted to approximately $0.25 per subscriber. ASCAP also seeks to invoke an offer by HBO in December 1985 to renew its license agreement with AS-CAP for an additional term on essentially the same conditions, except explicitly stated in terms of a "per-subscriber" rate of $0.24.1. ASCAP additionally cites the agreement of Disney Channel to an arguably similar rate for the period April 18, 1983 to December 31, 1985.[9]

SMC has launched a systematic attack on this approach, premised principally on the theory that ASCAP is a monopolist supplier of music rights, and therefore the results of its negotiations with music users merely ratify monopoly pricing. SMC also attacks the comparability of HBO's and Disney's agreements and suggests as well that if other negotiated fee arrangements must be looked to, they should be its own arrangements with BMI, which is ASCAP's principal rival in the music licensing industry.

We may accept as a general proposition that HBO and SMC are similarly situated since they are the two largest pay cable program suppliers, they supply a comparable range of programming with comparable use of music, they receive generally comparable payments on a per-subscriber basis from the cable system operators and each regards the other as its principal competitor for the growing pay cable TV market. (*E.g.*, Tr. 320–21, 331–35, 342–46, 348–54, 404; JPS at ¶¶ 6, 7.) Although SMC argues at length that HBO's greater commercial success during the relevant period—principally in terms of number of subscribers and costs (*e.g.*, Tr. 357–58, 368–69, 384; SMC Exh. D)—undercuts ASCAP's reliance on it as a comparable purchaser of rights, I find this argument to be unpersuasive. We can scarcely expect to find two purchasers of music rights who are in all respects identically situated, and this fact does not in itself preclude some measure of reliance on one purchaser's agreement as an indicator of reasonable rates for another purchaser, particularly in view of the somewhat impressionistic nature of this rate-setting exercise. Moreover, in this case the rate proposal of ASCAP would translate the HBO payments into a "per subscriber" figure, thus addressing at least the disparity in subscriber levels between HBO and SMC.[10]

That said, I nonetheless conclude, for a number of reasons, that the fees agreed to by HBO for 1980 through 1985, even if translated into a per-subscriber figure, have not been shown to constitute a reasonable rate for SMC.[11] Similarly, the cited Disney agreement does not constitute an appropriate model.

Most obviously, the terms of the cited agreements and offers, as well as the particular circumstances in which they were negotiated, demonstrate that they do not support ASCAP's requested rate for SMC. Furthermore, as a more general matter,

---

9. In its original version of the Joint Pre-trial Statement ASCAP pressed for a substantially higher rate based on an analogy to the rates being paid by the television networks. In the course of that presentation ASCAP argued at some length that prior agreements with the cable program suppliers were not reliable guides to a fee for SMC. (*See also* Tr. 124–28.) Although its current position is, of course, inconsistent with the earlier version of its case, I do not view ASCAP as bound in any sense by its superseded analysis. At most, this sequence of events underscores the fact that the entire process of rate-setting under the Consent Decree inevitably involves a significant degree of discretion in evolving an appropriate analysis precisely because of the lack of any competitive market data or reasonably precise alternate standards.

10. I note that if the HBO–ASCAP agreements actually reflected a competitive market rate, then the degree of HBO's commercial success would plainly be irrelevant since all purchasers in a competitive market receive the same price. Indeed, both parties appear to assume in any event that relative profitability should not control. (*E.g.*, Tr. 103; Gerber Dep. at 136–37; Deposition of Ross Charap at 188 (SMC Exh. V).)

11. Under the Decree ASCAP bears the burden of establishing the reasonableness of its requested fee..

ASCAP's substantial control of the market for the music rights of its members and the cable companies' past perception that they had virtually no economically viable alternative to a negotiated fee for ASCAP's blanket license caution against assuming that the rates incorporated in the agreements and offer cited by ASCAP represent a reasonable rate for SMC. I first address the specifics of the cited agreements and offer.

### 1. HBO and Disney Licenses Distinguished

The agreement between ASCAP and HBO for the 1980–82 period was reached at an early stage of HBO's commercial success, and specifically provided that it was "experimental" in nature. (Joint Exh. 7 at ¶ 1(C); Charap Dep. at 34.) It is doubtful, therefore, that it reflects an educated assessment by HBO of its long-term prospects, much less of the value of the ASCAP repertory to its anticipated success. In any event, this early period is well before the time period at issue here.

As for the HBO–ASCAP agreement covering the 1983–85 period, it included a so-called "most favored nation" provision under which HBO would be entitled to a reduction in its fee if ASCAP subsequently reached agreement with SMC on a fee that was lower than the rate charged to HBO. (Joint Exh. 8 at ¶ 4(A).) Whatever may have been the likelihood of such an eventuality,[12] HBO's insistence on this clause undercuts the notion that it was agreeing, without qualification, to pay the amounts specified in the agreement. (*See* Deposition of Howard Schlieff at 121–22, 190–94,

247–48.)[13] Of necessity, then, any valuation of the benefit of the bargain to AS-CAP would have to reflect a discount from the amounts stated in the contract in order to account for this contingency, although the amount of such a reduction is entirely a matter of speculation on the present record.[14]

Still another technical problem with the use of the 1983–85 HBO agreement as a model for SMC is that it was not cast in the form of a per-subscriber rate.[15] Rather, it stated the fee simply as a sum certain to be paid over a specified period of time. This is significant for our purposes because HBO's negotiator has testified credibly, and without contradiction, that in agreeing to the sums embodied in the agreement for the period 1983 to 1985, HBO was relying upon certain projections of future subscriber growth. In the end, it turned out that these projections were over-optimistic and, as a result, the sums reflected in the 1983–85 agreement amounted in effect to approximately $0.25 per subscriber. (Schlieff Dep. at 109–10, 114–15, 182–83.)

The point of this distinction is that, if called upon to agree to a $0.25 per subscriber rate for the 1983–85 period—or an absolute sum that would have yielded this per-subscriber figure if HBO's projections proved accurate—HBO might have declined to do so; at the very least, ASCAP has not demonstrated by virtue of invoking the 1983–85 contract that HBO would have agreed. Accordingly, the underlying premise of ASCAP's reliance on the HBO agreements—that HBO willingly entered into one or more agreements to pay $0.25 per subscriber to ASCAP for a blanket license—is not borne out by the record.

---

12. The parties' efforts to settle this case, which have been noted from time to time, suggest that this possibility was not entirely illusory, at least when HBO and ASCAP actually entered into their agreement. *See, e.g., David v. Showtime/The Movie Channel, supra,* 697 F.Supp. at 754.

13. The deposition of Mr. Schlieff was received as SMC Exh. S.

14. An alternative argument is made by SMC based on the "without prejudice" language of

the HBO–ASCAP agreement. In effect SMC argues that this provision bars ASCAP from relying on the terms of the HBO agreement in this proceeding. (*See* Schlieff Dep. at 145.) This notion is questionable in view of the actual language of the agreement, which appears to be intended to protect HBO, not SMC. (*See* Joint Exh. 8 at ¶¶ 1(E), 11.)

15. The HBO offer of December 1985 was cast in the form of a per-subscriber rate.

As for HBO's offer in December 1985 to extend its agreement with ASCAP at a rate of $0.24.1 per subscriber (ASCAP Exh. 2), ASCAP seeks to introduce this proposal for various purposes. Principally, the offer is said to be relevant as evidence of HBO's willingness to pay that rate at that time for the blanket license and thus as probative of what a reasonable rate would be for a similar time period. In addition, ASCAP argues that this offer undercuts the assertion by HBO's negotiator, Mr. Schlieff, that in negotiating the agreement for the preceding period—1983 to 1985—HBO would have been unwilling to pay more than approximately $0.20 per subscriber. SMC objects to consideration of the offer for these purposes, citing Fed.R.Evid. 408.

This proposal by HBO was invoked by ASCAP in another proceeding, commenced by HBO, and was rejected by this Court as inadmissible for this purpose under Fed.R. Evid. 408 and the implicit policy of the Consent Decree. *See* In re *Home Box Office, Inc.,* Memorandum and Order at 16–19 (S.D.N.Y. July 11, 1986.) In this instance I find it admissible although not especially probative.

The principal distinction between the two cases is that in this proceeding ASCAP does not seek to use the "settlement" offer of HBO against the offeror. The offer was made to avoid a proceeding concerning HBO's fees, and it is now being offered in a proceeding that is designed to set a fee for SMC.

Although at least one court has indicated that the common-law rule against admission of statements made in the course of settlement discussions applies only between the parties to the negotiation, *see* Huntley v. Snider, 86 F.2d 539, 540 (1st Cir.1936), the Second Circuit has not so limited Rule 408. Instead, it and other courts have indicated that Rule 408 may bar introduction of settlement discussions, or agreements, even if the settlement involved another case and a different party.

See Playboy Enterprises, Inc. v. Chuckleberry Pub. Inc., 687 F.2d 563, 568–69 (2d Cir.1982); *see also American Ins. Co. v. North American Co.,* 697 F.2d 79, 82 (2d Cir.1982). *Accord, U.S. v. Contra Costa County Water District,* 678 F.2d 90, 92 (9th Cir.1982); *Young v. Verson Allsteel Press Co.,* 539 F.Supp. 193, 196 (E.D.Pa. 1982).[16] It must be noted, however, that these decisions all involved the proposed use of the offer against either the offeror or another party to the settlement. This distinction is significant because the most commonly accepted rationale for Rule 408 is that it encourages settlement by protecting parties to a settlement agreement or negotiation from having their good-faith efforts to settle a dispute used against them in subsequent litigation. As the Second Circuit has noted:

> Settlements have always been looked on with favor, and courts have deemed it against public policy to subject a person who has compromised a claim to the hazard of having a settlement proved in a subsequent lawsuit by another person asserting a cause of action arising out of the same transaction.

*Hawthorne v. Eckerson Co.,* 77 F.2d 844, 847 (2d Cir.1935).

Although Wigmore suggests that the underlying concern is one of relevance—that "an offer of compromise ... *does not* ordinarily proceed from and *imply a specific belief that the adversary claim is well-founded....*" 4 C. Wigmore, *Evidence* § 1061 at 36 (Chadborne rev. 1972) (emphasis in original)—this view has generally been rejected, since an offer may in fact be quite probative as to liability or damages, particularly if the offered amount is close to the figure that represents the adversary's maximum supportable damage claim. *See, e.g.,* 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 408 [02] at 408–17 to 20 (1986); Morgan, *Basic Problems of Evidence* 210–11 (1962); Cleary, *McCormick on Evidence* § 274, at 812–13 (3rd ed. 1984). *But see United States v. 46,672.96 Acres of Land, More or Less,* 521 F.2d 13, 17 (10th Cir.1975) (evidence of

---

**16.** Rule 408 bars the use of such evidence only for the purpose of establishing either liability or the amount of damages.

prices paid to avoid condemnation proceedings). Instead, as Judge Weinstein notes, "Rule 408 is based upon the policy of aiding the compromise and settlement of disputes." 2 *Weinstein's Evidence, supra,* at 408–19 (citing cases). *See, e.g.,* Fed.R.Evid. 408 Notes of Advisory Committee (stating that this is "[a] more consistently impressive ground" for the Rule); S.Rep. No. 93–1277, 93d Cong.2d Sess. (1974), reprinted in 1974 U.S.Code, Cong. & Admin.News 7051, 7056; C. Wright & K. Graham, *Federal Practice & Procedure* § 5302, at 173 (1980); *Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506, 510 (2d Cir.1989); *Fiberglass Insulators, Inc. v. Dupuy,* 856 F.2d 652, 654–55 (4th Cir.1988).

The implication of this policy for our case is that settlement offers or agreements are not automatically inadmissible—even as to liability or the amount of damages—if they are offered against a party who was not a participant in the settlement discussions or agreement. *See Kennon v. Slipstreamer, Inc.,* 794 F.2d 1067, 1075–76 (5th Cir.1986) (Thornberry, J., dissenting). Rather the Court must assess the degree of relevance and potential prejudice of the evidence in light of the particular circumstances of the case. *See e.g., Wyatt v. Security Inn Food & Beverage, Inc.,* 819 F.2d 69, 71 (4th Cir.1987); *Kennon v. Slipstreamer, Inc. supra,* 794 F.2d at 1076 (Thornberry, J., dissenting) (suggesting applicability of Fed. R.Evid. 403).

In this case the introduction of the HBO offer against SMC plainly does not pose the same danger to the policy of encouraging settlements as would the proscribed use of such an offer against HBO itself. Furthermore, in this unusual type of proceeding, it may fairly be said that a significant part of the court's inquiry inevitably concerns the process of negotiation by would-be licensees for blanket licenses from ASCAP and other comparable entities. Although we may conclude, for various reasons, that some of these negotiations and agreements are not reliable indicators of a reasonable fee for SMC, there is no cogent reason for finding that the 1985 HBO offer is so uniquely irrelevant to our inquiry that it should not find its way into the evidentiary record for this purpose.

As for potential prejudice, I note that all of the many offers and agreements that are being cited by ASCAP and SMC are being subjected to close scrutiny by the Court and will not be relied upon to any greater extent than is justified by the particular circumstances in which they were made. As will be seen, I find that HBO's having made its 1985 offer does not demonstrate the appropriateness of imposing that proposal on SMC; nonetheless, it is admissible as at least relevant to that issue since admission would not contravene the policy underlying Rule 408.[17]

Although admissible, HBO's offer is not persuasive as proof of what would be a "reasonable" rate for SMC. The HBO offer was to renew the prior agreement, and that prior contract encompassed a "most favored nation" provision. Thus, even if it had been accepted by ASCAP, HBO could ultimately have achieved a lower fee if ASCAP settled with SMC. Accordingly, HBO's fee proposal does not represent an unconditional agreement to pay the quoted fee. (*E.g.,* Schlieff Dep. at 121–22, 190–94, 247–48.)[18]

---

**17.** One could argue that HBO might be prejudiced in the long run by introduction of its offer here, since it could affect the decision of the Court with respect to SMC's license and this result could in turn affect the result in HBO's pending fee proceeding. This argument, however, encompasses a far greater degree of speculativeness than the Court is prepared to accept on the current record, even if we assumed that SMC has standing to object on this ground.

**18.** The HBO offer does raise some question as to whether, if pressed in 1983, HBO would have agreed to a higher fee than $0.20 per subscriber. Even taking this possibility into account, I find that proposition to be entirely speculative on the current record. Moreover, for reasons to be noted in our discussion of relative bargaining leverage, the fact that HBO might at some point have been willing to pay $0.24 per subscriber does not, in itself, demonstrate that such a fee is appropriate for SMC in an Article IX proceeding.

The final agreement that ASCAP cites in support of a $0.25-per-subscriber fee for SMC is the Disney Channel license, which involved payments variously estimated as amounting to $0.21 to $0.29 per subscriber for the period from April 1983 to the end of 1985. (Joint Exh. 10.) The principal problem with the proposed use of this agreement is that the Walt Disney Music Company owns the rights to much of the music aired on the Disney Channel and is a member of ASCAP. Accordingly, the use by the Disney Channel of that copyrighted music as a significant portion of the musical fare on its programming means that the Disney organization will recoup a large portion of the moneys it pays to ASCAP by way of royalties to its publishing house. (Deposition of Peter Nolan at 50, 52.) [19] Thus, in effect, Disney ends up paying substantially less than $0.25 per subscriber [20], and indeed this consideration apparently contributed significantly to its willingness to agree to the fee that ASCAP now seeks to impose on SMC. (*See* Charap Dep. at 287–89; Nolan Dep. at 52, 61.) Furthermore, I note that the Disney Channel agreed to these fees at an early stage of its existence, when it was seeking to minimize substantial unplanned expenses—such as the cost of litigation in the rate court, with the attendant risk of an unfavorable outcome—and that its agreement to the stated fees for that early period appears to reflect a host of considerations that would undercut any assumption that the agreed-upon rate was representative of what a competitive market would produce. (*See* Nolan Dep. at 60–61, 129–30.)

## 2. *Inequality of Bargaining Power*

The more global difficulty with ASCAP's reliance on any of these various agreements or offers is that, although they resulted from so-called "arms length" negotiations, they do not necessarily reflect rates that have a discernible relationship to what a competitive—or even partially competi-tive—market would produce, and ASCAP offers no other persuasive reason for relying on them.

We start from the premise, adopted in prior fee-setting decisions, that license agreements entered into by parties in circumstances comparable to those of the litigants may provide guidance in setting a reasonable fee in a rate proceeding. *See e.g.,* In re *Buffalo Broadcasting Co.,* Memorandum & Order at 12–17 (S.D.N.Y. Feb. 17, 1987); In re *Home Box Office, Inc.,* Memorandum & Order at 3–16 (S.D.N.Y. July 11, 1986); In re *Showtime/The Movie Channel Inc.,* Opinion and Order at 8–23 (S.D.N.Y. Jan. 14, 1985). *Accord, Amusement & Music Operators Ass'n v. Copyright Royalty Tribunal, supra,* 676 F.2d at 1155–57. *Cf. Krinsk v. Fund Asset Management, Inc.,* 875 F.2d 404, 411–12 (2d Cir.1989). The relevance of such agreements depends upon whether they can fairly be viewed as the product of market control by ASCAP or as some indication of what prices would be set in a comparatively competitive market. Plainly, if the terms of the agreement reflect the fact that the licensee had no realistic alternative, it would be fair to infer that those agreements could not be the source of a "reasonable" fee. *Cf. Gartenberg v. Merrill Lynch Asset Management, Inc.,* 694 F.2d 923, 929 (2d Cir.1982).

To assess the relevance of these "comparable" agreements, we must address two questions—first, does ASCAP have the sort of leverage that, if utilized, would likely compel the cable program suppliers to agree to non-competitive, or excessive, fee levels, and, second, has ASCAP in fact exerted such leverage to achieve this result. The answer to both questions is a qualified "yes".

In order to compete effectively, SMC and the other cable companies must have licenses covering their use of all of the music

---

**19.** The deposition of Mr. Nolan was received as SMC Exh. T.

**20.** Apparently Disney recoups approximately $0.28 per dollar paid to ASCAP. (Nolan Dep. at 56.) This would reduce the per-subscriber cost to approximately $0.18.

encompassed in the type of programming for which their subscribers are paying. In part for historical reasons of industry practice, they have come to rely exclusively on blanket licenses issued by ASCAP, BMI and the third of the music licensing societies, SESAC, rather than seeking licensing from another source—such as the composers themselves (direct licensing) or the producers of the programming that they purchase (source licensing)—or demanding per-program licensing from the societies. (*E.g.,* Tr. 491–92, 746–50.)

Because SMC and its competitors have come to rely on the blanket license, the societies—particularly ASCAP, which is the largest of these organizations—have acquired a significant degree of bargaining leverage. This has occurred because of the perception on the part of most, if not all, of the cable companies that they have no realistic alternative to meeting ASCAP's irreducible demands. (*E.g.,* Tr. 456–60, 746–50.) Based on this claimed lack of any economically viable alternative to the blanket license, SMC argues that negotiations serve merely to validate the monopolistic prices that ASCAP can extract by virtue of its stranglehold on the market for use of its members music.

ASCAP strongly disputes the notion that it is "a monopolist" and urges that if SMC's premise is rejected, then the negotiated agreements may be relied upon in setting fees. It particularly cites court decisions in two cases that have rejected antitrust challenges to its use of the blanket license. One involved a challenge by the CBS television network and the other a suit by a nationwide group of local television stations. In each case the court, in effect, found that the plaintiffs there had not demonstrated that they lacked alternatives to the blanket license as a means of access to the music used on their programs, and therefore they had not demonstrated that ASCAP's use of the blanket license involved an unreasonable "restraint of trade" under section 1 of the Sherman Act. *See BMI v. CBS,* 441 U.S. 1, 23–24 [99 S.Ct. 1551, 1564, 60 L.Ed.2d 1] (1979), *rev'g* 562 F.2d 130 (2d Cir.1977), *rev'g* 400 F.Supp. 737 (S.D.N.Y.1975); *CBS v. ASCAP,* 620 F.2d 930, 935 (2d Cir.1980) (on remand from 441 U.S. 1 [99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) ] ), *cert. denied,* 450 U.S. 970 [101 S.Ct. 1491, 67 L.Ed.2d 621] (1981); *Buffalo Broadcasting Inc. v. ASCAP,* 744 F.2d 917, 924–33 (2d Cir.1984), *cert. denied,* 469 U.S. 1211 [105 S.Ct. 1181, 84 L.Ed.2d 329] (1985).

The parties' dispute over the significance of these decisions for the present case appears in some measure to skirt the point. Even if the mode of analysis in these cases were directly pertinent here, it is questionable whether these decisions would control with respect to SMC. In any event, these cases are not directly relevant.

We may fairly accept, at least as a possibility, that if CBS or the local television stations chose to undertake source or direct licensing or utilized the per-program license either as an economic alternative or as a bridge to full source or direct licensing, they might in the long run limit the economic leverage exercised by ASCAP through its use of the blanket license. Indeed, despite the contrary testimony of SMC's economic expert, Dr. Benston, it appears that the decisions in *CBS* and *Buffalo Broadcasting* compel us to acknowledge this possibility since the plaintiffs in both of those cases offered virtually identical expert testimony and the courts nonetheless concluded that restraint of trade by use of the blanket license had not been proven.

It is also certainly conceivable that if HBO (or the Disney Channel or SMC) chose to forego a blanket license in favor of attempting source or direct licensing, it might in the long run obtain licensing coverage for much if not all of its programming. In the meantime, to bridge the gap, it would still have to pay for a blanket license or a per-program license (if ASCAP relented from its initial refusal to quote a fee for such a license), or else forego a substantial part of its programming. Even if HBO survived the inevitably higher costs and competitive disadvantages vis-a-vis the other cable companies during this interregnum, it is fair to assume that in the long term the pursuit of such an endeavor

would not save the company much, if any, money since copyright holders would have no incentive to agree to lower rates than those paid to them now via ASCAP, and HBO would then be saddled *in futuro* with the substantial costs that it now avoids by reliance on the blanket license. (Tr. 545–51.) (*See also* Schlieff Dep. at 85–86.) *See generally* Cirace, *supra*, 47 Ford.L.Rev. at 292 n. 99.

We must further bear in mind that the individual cable companies might well find it more difficult than either CBS or the nationally organized local television industry to induce large numbers of copyright holders to forego reliance on the blanket license. CBS is, of course, one of a small handful of national networks,[21] with the advantages of a very high public profile, substantially greater revenues than the individual cable companies, more control over the content of its programming, and a parent that controls a large business in music publication. As the Second Circuit noted in rejecting CBS's antitrust challenge, "we have some difficulty even contemplating the feared situation of individual songwriters displaying reluctance to arrange to have their songs performed on a national television network, especially one owned by 'the giant of the world in the use of music rights.'" *CBS v. ASCAP, supra,* 620 F.2d at 937–38 (quoting *CBS v. ASCAP, supra,* 400 F.Supp. at 771).[22]

As for the local television stations, they have the bargaining advantage of negotiating jointly through their All–Industry Committee. *See, e.g.,* Sobel, *supra,* 3 Loyola Ent.L.J. at 39–40 (countervailing power of organized buyers); *see also id.* at 31–32 (in the music industry, if three or fewer major buyers, they "have substantial monopsony power—the power to lower prices.") (quoting Cirace, *supra,* 47 Ford.L.Rev. at 281 n. 34). The local stations have the further advantage that by virtue of their number they represent a much larger source of revenue to ASCAP and a much more difficult industry to police for copyright infringement. *Id.* at 34, 40 (substantial cost to sellers of policing large number of potential users for infringing activities limits seller's ability to charge above competitive price).[23] These circumstances also suggest that they may be able to negotiate on more equal terms with ASCAP than could the individual cable program suppliers. *See Broadcast Music, Inc. v. Moor Law, Inc.,* 527 F.Supp. 758, 764 (D.Del.1981), *aff'd mem.,* 691 F.2d 490 (3d Cir.1982).

In any event, we need not speculate as to whether the circumstances in which HBO and Disney found themselves in the mid–1980's were sufficiently dissimilar to those of CBS and the local television stations to have permitted an antitrust challenge by the cable companies.[24] Our concern is to set a fair rate for the blanket license on the assumption that its use by ASCAP is consistent with the antitrust laws. What is relevant for our purposes is the relative bargaining power of ASCAP and the cable companies in negotiating a price for the blanket license. If the negotiating parties

---

**21.** The market of national networks—whether defined as three or four—is small enough to be considered "highly concentrated." *See Sobel, supra,* 3 Loyola Ent.J. at 31.

**22.** The Circuit Court went on to uphold Judge Lasker's finding, based on the trial record in that case, that "if CBS were to seek direct licensing, 'copyright proprietors would wait at CBS' door.'" 620 F.2d at 938 (quoting 400 F.Supp. at 779).

**23.** Although current number are uncertain, the All–Industry Committee apparently represents well over 800 stations (JPS at ¶ 51) and the annual fees payable under the most recent interim fee order for the blanket license total $60 million. (JPS at ¶ 54.) By comparison, if AS-

CAP were awarded the fee it seeks from SMC in this proceeding its annual revenue would amount to approximately $2 million.

**24.** I note that in a concurring opinion in *Buffalo Broadcasting,* Judge Winter suggested that *CBS* and *Buffalo Broadcasting* demonstrate that the blanket license can never be deemed to violate section 1 of the Sherman Act. 744 F.2d at 933–34. It appears that the other members of the panel were not prepared to adhere to that conclusion. *See id.* at 924–25 (indicating the necessity of examining the effect of blanket license on the specific category of users involved in that case); *id.* at 933 ("the context in which the blanket license is challenged can have a significant bearing on the outcome").

exert generally equivalent bargaining leverage, the results may be viewed as a reasonable equivalent of a competitive market. *See, e.g.,* Sobel, *supra,* 3 Loyola Ent. L.J. at 39 (citing, *inter alia,* J. Bain, *Industrial Organization* 152 (2d ed. 1968)). If not, it is doubtful whether the resulting agreements are appropriate guides to a reasonable rate.

For the reasons already noted, it is questionable whether any of the cable companies could have made effective use of direct or source licensing, especially within the limited time period in which the blanket license agreements cited by ASCAP were concluded. Furthermore, the principal other alternative suggested in *CBS* and *Buffalo Broadcasting*—the use of a per-program license—has until now apparently been for all practical purposes unavailable to HBO and the other cable program suppliers since ASCAP has declined until recently to make one available to them based on its interpretation of the Consent Decree. (*See* pp. 69–72 [pp. 596–597], *infra.*) [25]

The one remaining alternative, invocation of the rate court's jurisdiction, has always been available, although the testimony of both SMC's representatives and especially the negotiators for the other cable companies suggests that they looked upon this Court with what can fairly be described as measured aversion. (*E.g.,* Nolan Dep. at 60; Schlieff Dep. at 92, 103.) Their concerns, as expressed in testimony, involved both the belief that this Court was "ASCAP-friendly," and the assumption that participation in a rate proceeding was exceedingly expensive. How expensive is not made clear on the present record, although the unstated implication is that they assumed that the added expense exceeded the likely reduction, if any, that they would obtain from ASCAP's demanded fees. [26] *Cf. Buffalo Broadcasting Co. v. ASCAP, supra,* 744 F.2d at 927 (television stations described as "represented by a vigorous committee with the demonstrated resources, skill, and willingness to invoke the rate-adjustment process.")

Regardless of how these witnesses characterize their reasons for not resorting to the rate court, their testimony is at least credible in indicating that their decision was not based on any purported assumption that the rates that they agreed to were in any meaningful sense "reasonable." Rather, given the absence of any track record in the rate court and the fact that such a proceeding would probably be expensive, a cautious businessman would likely opt for even a fairly high fee to avoid both the uncertainty of the alternative result and the likelihood of substantial expense involved in pursuing it. Furthermore, since the amounts of money payable even under the ASCAP formula do not constitute a large proportion of the companies' overall costs, it was certainly understandable for these companies to agree to payments that they may have viewed as "excessive."

In short, it may fairly be said that there have been substantial constraints, both objective and subjective, on the willingness of the cable companies to invoke alternatives to ASCAP's blanket license demands. Whether these constraints were realistically assessed by the would-be ASCAP licensees may have been a crucial question for the antitrust suits, in which the plaintiffs bore the burden of proving that ASCAP (and BMI) used the blanket license to restrain competition unreasonably, but it is not so in this setting, in which ASCAP

---

**25.** Whether the cable companies could have compelled the issuance of such a license by resort to the rate court is uncertain, given the lack of any definitive ruling until now on the meaning of Article V, and in any event such an alternative obviously involved some additional expense as well as uncertainty with respect to both the merits of the decree construction issue and the costliness of the license that would ultimately be made available.

**26.** Although ASCAP would presumably be required to pay an equivalent cost in litigation (Tr. 810–11), its assumption that the Court would view its position with favor would probably justify the expenditure involved, particularly since a favorable ruling would inevitably have substantial and very beneficial effects on its negotiating position with other similarly situated licensees.

bears the burden of demonstrating that the rate it seeks is reasonable and that such reasonableness can be measured by what some of the cable companies agreed to pay in the past. Even if these companies were mistaken in believing they lacked viable options, their *bona fide* belief that this was the fact is relevant in assessing whether the negotiated agreements are an appropriate measure of a reasonable fee.

Based on a review of the testimony of record and the data on other licensing agreements, I conclude that the cable companies—much like the networks, local television stations and other licensees—have in fact assumed in the past that direct or source licensing was economically unfeasible and that per-program licenses, even if offered by ASCAP or ordered by the rate court, would be too expensive.[27] It appears as well that the cable companies other than SMC also assumed—whether correctly or not—that the rate court was not an economical alternative for them, presumably because it was thought to be a costly process and one fraught with uncertainty as to the ultimate result.[28] (*E.g.*, Schlieff Dep. at 103–05; *see also* Tr. 573–74.)

The validity of these assumptions is not crucial for our purposes; this is not an antitrust suit and we are not called on to determine whether ASCAP has violated the Sherman Act. It suffices to observe that the concerns of the cable companies appear to have constrained their negotiating posture, and this supports the conclusion that

prior negotiated agreements—even though agreed to after "arm's length" negotiations—are not necessarily appropriate as a dollar-for-dollar measure of a "reasonable fee" for SMC.[29]

Given the apparent limitations—whether self-imposed or not—on the cable companies' bargaining leverage, we would strongly question the appropriateness of relying on the old ASCAP license agreements even if they were not, on their face, readily distinguishable. Moreover, this impression is further reinforced by the evidence that ASCAP's posture in negotiations took advantage of this apparent weakness in its interlocutors' position. In short, it may fairly be concluded that the agreements reached by ASCAP with the cable licensees reflect a *de facto* but significant inequality of bargaining leverage.

Represented by counsel who has had substantial experience in dealing on AS-CAP's behalf with the broadcasting industry, ASCAP appears to have followed a sophisticated approach to maximize its long-term revenues. ASCAP routinely issues a license at no fee or a nominal fee to fledgling companies, in the hope that they will prosper and ultimately be able to afford substantial fees. (Charap Dep. at 201–02.) Upon realization of this goal, AS-CAP typically has demanded, as a price for re-licensing, sharply increased fee levels at each renewal. (*E.g.*, Schlieff Dep. at 50–51; Gerber Dep. at 47–50; Charap Dep. at

---

**27.** The latter view has apparently changed to a degree—at least on the part of the local television stations—in the wake of this Court's interim fee decision in the *Buffalo Broadcasting* proceeding. (*See* Memorandum and Order dated February 17, 1987 at 28–37.) The Court ordered the issuance of per-program licenses on terms later more fully fleshed out by stipulation of the parties, and apparently some number of local stations have opted for this approach in lieu of the blanket license.

**28.** The willingness of these companies to forego a rate proceeding may also have been enhanced by their assumption that the current proceeding, in which SMC bears the entire financial cost of pressing the cable industry's position, would

provide a definitive result without cost for those on the sidelines. (*See, e.g.,* Nolan Dep. at 60.)

**29.** ASCAP urges that we not take at face value the attempts by the cable companies' negotiators to characterize the results of their arms-length negotiations as unfair to them or extortionate. I do not rely upon self-serving characterizations of this sort, but rather look to the observable facts, including both the economic circumstances in which the cable companies operated and the specific actions that they undertook during the relevant period of time. To the extent that their negotiators have described in testimony the course of negotiations with AS-CAP and the rationale for the decisions that they made, I find their testimony in general to be credible as well.

102, 116–18; *see* Fagan Dep. at 47–48.) *See also* Cirace, *supra,* 47 Ford.L.Rev. at 287–88. In so doing ASCAP has chosen in each instance to negotiate an agreement first with the largest music user in the industry—in this case HBO—and has then used that agreement as a floor in its dealings with the other companies, based on its invocation of Article IV(C), the non-discrimination provision of the Consent Decree. (Tr. 848–49; Gerber Dep. at 58, 90; Charap Dep. at 18–21, 80, 85, 110–12, 115.)[30] In conducting these negotiations ASCAP's representatives have also taken pains to impress upon the licensees the expense and uncertainty of any resort to the rate court, with the attendant threat that ASCAP would seek far higher fees in court. (Tr. 837–40; Charap Dep. at 60.) The unmistakable message conveyed is that ASCAP viewed the rate court as a receptive forum for its views and that the licensee would be well advised to settle since the rate court might award fees substantially in excess of those then being offered by ASCAP. (*E.g.,* Schlieff Dep. at 236–39; *see also* Charap Dep. at 60, 63–64.)

In addition, in its dealings with the cable program suppliers ASCAP has in the past declined to offer any per-program license at all, citing its own reading of Article VII(B) of the Consent Decree. Although the attorneys for the cable companies might have advised their clients that this reading was doubtful—indeed, that issue is now before this Court—the prospect of having to litigate both that legal issue and the appropriate fee for a per-program license served in effect as a further deterrent to the cable companies resorting to this forum.

These negotiating tactics are cited, not in criticism of ASCAP, but rather as indicative of the fact that ASCAP's negotiating posture has been forceful, and has taken advantage of perceived weaknesses in the licensees' negotiating posture. The point is not that there are no objective constraints on ASCAP's negotiating leverage, but rather that the conjunction of these factors has led to negotiated fees seemingly in excess of what one would expect to be produced if the licensees did not believe themselves largely constrained to obtain a blanket license on the basis of a negotiated settlement with ASCAP.[31]

This conclusion is buttressed by the seeming anomaly that these same licensees have reached agreements with ASCAP's principal counterpart—BMI—at markedly lower rates, generally ranging, in effect, from $0.09 to $0.13 per subscriber in recent years. (*E.g.,* Gerber Dep. at 118; Schlieff Dep. at 173–74.) The anomalousness of this result rests on several facts. First, although BMI has a smaller repertory than does ASCAP—approximately one million compositions compared to about three million (*see* Deposition of Edward Cramer at 11–12)[32]—there seems no question that the cable companies need the same protection with respect to that repertory as they require with regard to the ASCAP music; simply stated, there is so much BMI music enmeshed in their programming that they must obtain a license from BMI. (Tr. 580; Schlieff Dep. at 61–62, 153.) Second, both societies appear about equally well positioned to extract fees for their licenses since they operate under equivalent consent decrees and both offer the blanket

---

**30.** Article IV(C) provides: "Defendant ASCAP is hereby enjoined and restrained from: … '(c) Entering into, recognizing, enforcing, or claiming any rights under any license for rights of public performance which discriminates in license fees or other terms and conditions between licensees similarly situated."

**31.** These conclusions are in no respect inconsistent with the antitrust decisions in *CBS* and *Buffalo Broadcasting,* which are invoked by AS-CAP. As noted, both of these cases involved an assessment of whether in fact, the plaintiffs there had proven that they lacked a realistic

alternative to the blanket license. Moreover, even if ASCAP had monopoly power, its mere use of that leverage to demand higher prices, as suggested here, would not in itself violate the antitrust laws, *see, e.g., United States Football League v. National Football League,* 842 F.2d 1335, 1360–61 (2d Cir.1988), but it would certainly be relevant to this Court's determination of whether a fee should be based on the results of negotiations between ASCAP and its licensees.

**32.** The deposition of Mr. Cramer was received as SMC Exh. X.

license as their principal or sole form of licensing to the cable companies.

Not surprisingly, in their dealings with licensees comparable to the cable program suppliers and with each other, ASCAP and BMI have agreed to fees that are generally in a similar range. (*See, e.g.,* Tr. 95–99; ASCAP Exh. 3.) Thus, their respective blanket licenses with the television networks reflect a ratio between ASCAP and BMI of approximately 1.18–to–one (Tr. 160, Joint Exhs. 28, 30, 33; ASCAP Exh. 6; JPS at ¶¶ 44–50), even though the networks use far more ASCAP than BMI music (Tr. 191); their agreements with the local television industry reflect a ratio of about 1.43–to–one (ASCAP Exh. 5); their agreements with the local radio industry reflect a ratio of about 1.16–to–one (Tr. 97); and their licenses with the MTV network provide for virtually equal license rates. (JPS at ¶ 36, SMC Exh. E.)[33] In addition, ASCAP and BMI have agreed to divide the royalties paid by cable system operators for cable retransmission of programs on the basis of an approximately 1.2–to–one ratio. (Joint Exh. 42; Tr. 859.)

In striking contrast, the agreements cited by ASCAP in this proceeding—with HBO and Disney—reflect a far higher fee rate than either of these licensees, or SMC, is paying BMI; indeed the ratio between ASCAP and BMI fees that would result if ASCAP were awarded a $0.25 rate would be on the order of 2:1. Although ASCAP argues that this far greater differential

reflects the cable companies' valuation of the respective blanket licenses issued by ASCAP and BMI, there is little, if anything, in the record to support this conclusion. Indeed, the record plainly demonstrates that the relevant licensees seek the lowest rates that they can obtain from ASCAP and from BMI, and thus the results appear to reflect largely the perceived relative bargaining leverage of the negotiating parties. Since a reasoned evaluation of the ASCAP and BMI licenses suggests that their value to the cable companies does not greatly differ—as we noted, both are plainly necessary for the current operations of the cable program suppliers—it is reasonable to infer that the ratios reflecting a nearly one-to-one relationship between ASCAP and BMI are better indicators of equivalent bargaining leverage between licensor and licensee, and that the rates cited by ASCAP are therefore probably in excess of a range of reasonable fees.[34]

The foregoing considerations strongly suggest that $0.25 is not a reasonable fee for SMC. Moreover, ASCAP's arguments to the contrary do not carry much force. In substance ASCAP suggests that the very fact that HBO and Disney agreed to comparable fees compels the conclusion that they are reasonable rates for SMC. This *ipse dixit* form of argument fails to explain why those rates are appropriate surrogates for the "reasonable fee" that we are instructed to set, and fails to deal with the congeries of record evidence sug-

---

**33.** The agreement with BMI for 1987 through 1989 covers both the MTV services and SMC and involves a total payment of $6.6 million. According to Viacom's General Counsel, Gregory Ricca, approximately $4 million of this sum is informally allocated to the MTV services although the agreement is silent on this matter. (Tr. 477–78.) This would yield a payment to BMI of approximately $1.3 million per year, as compared to a payment to ASCAP of $1 million per year. (*See* JPS at ¶ 36.) Even if we assume, however, that only half of the $6.6 million is allocable to the MTV services, the resultant payments for the MTV services to BMI would slightly exceed those made to ASCAP for the same period.

**34.** One may speculate as to the reasons why the few cable companies that have entered agree-

ments with both ASCAP and BMI have ended up paying far more to ASCAP. Whether or not this is a product, in some measure, of differing negotiating philosophies or practices on the part of the two societies is uncertain, although the record might support such an inference. (*See, e.g.,* Tr. 579 (noting that BMI agreed to "carve out" provision in blanket license agreement with HBO); Schlieff Dep. at 82–84.) *Compare with United States v. ASCAP,* 586 F.Supp. 727 (ASCAP successfully resists efforts by networks to obtain "carve out" form of blanket license). In any event, for our purposes it need only be observed that the difference in fees has not been shown on the present record to reflect any meaningful economic distinction between the two licenses or any difference in the licensees' evaluation of the benefits of those licenses.

gesting that these rates rest somewhere above a range of reasonable rates.[35]

### C. SMC's Proposal for an Economic Analysis

As an alternative to ASCAP's proposal, SMC urges that an appropriate blanket license fee reflect the intrinsic value of the music that is made available under the license. To that end it offers an elaborate scheme for measuring what it contends is the fair or competitive market value of the music. Although I am ultimately unpersuaded by SMC's case, it deserves some detailed attention.

SMC starts from the premise that AS-CAP is in fact a monopolist, notwithstanding the arguably contrary conclusions of the Second Circuit and the Supreme Court, and that therefore the Court cannot rely on any of the agreements into which it (or BMI) has entered. Instead, SMC proposes that the Court view music as simply one of a number of so-called creative services utilized in the production of a film or television program, and it suggests that the valuation of such creative services in a more competitive market than the music industry will provide a reliable approximation of how music would be valued in a competitive market.

SMC's specific analysis involves a two-step process in which it utilizes certain data concerning payments made by producers to obtain two other forms of creative services for the production of their films—screenwriting and direction.[36] Since the issue in this proceeding concerns the amounts that should be paid for the right to use copyrighted music in programming on cable television, SMC initially focusses upon the level of payments made to screenwriters and directors in connection with the exhibition of their films on cable television. (Tr. 587–88.) For this data it looks to the respective collective bargaining agreements of the Screenwriters Guild and the Directors Guild of America, each of which provides for payment of residuals to their members for cable performances, at the rate of 1.2 percent of the amount paid by the pay cable television service to the film distributor. (*Id.;* Joint Exhs. 37–38.)

If the same figure were applied directly to value music rights in connection with the performance of films or other programming on cable television, the resultant fee for SMC would approximate $0.32 per subscriber. SMC, however, posits that music is generally a far less important creative element in the artistic, and presumably financial, success of a film than are such inputs as the script, the direction, and the acting. Accordingly, it offers a methodology for discounting from the 1.2 percent figure in order to arrive at an appropriate fee for music use.

To accomplish this task, SMC selected an assertedly representative sample of made-for-theatre films that had been shown on its program services, and then sought to obtain from the producers of these films data indicating the amount of money spent "up front" by the producer to obtain screenwriting, directorial and musical ser-

---

**35.** I note that the relevant circumstances in this case differ significantly from those found in the *Buffalo Broadcasting* interim fee proceeding, in which the applicants were held, in significant measure, to the fee levels that they had agreed to pay in the past. As the Court there noted, for interim fee purposes ASCAP met its initial burden to demonstrate the reasonableness of its proposed fee by showing that the applicants had previously agreed to the same fee level, and in those circumstances the licensees would have to come forward with evidence suggesting that the prior fee level did not reflect a reasonable rate. (Memorandum and Order dated February 17, 1987, at 27.) In this case, SMC has never agreed to the fees reflected in the HBO and Disney agreements, and there is no reason to assume, merely because those other companies accepted

them, that they necessarily reflect a reasonable rate rather than the fact of ASCAP's strong bargaining leverage in negotiating with the cable companies over a blanket fee rate. In fact, that is what the record suggests, and accordingly I conclude that ASCAP has failed to carry its burden to demonstrate that $0.25 per subscriber is a reasonable rate for SMC.

**36.** SMC's analysis focuses solely on made-for-theatre films, although a small percentage of its programming—twenty percent for Showtime and five percent for The Movie Channel—does not involve such films. I assume for present purposes that this limitation on its data universe does not seriously bias the results obtained.

vices. (Tr. 590, 595.) Ultimately SMC obtained data of this sort from four studios reflecting either actual outlays or the relative size of such expenses for fifty films. (Tr. 599–600.)[37] They did not receive data from a number of major studios, including Warner, Universal, Columbia and Disney. (Tr. 675–76.) Although the results vary very substantially from film to film, when aggregated they reflect that on average the producers spent substantially less money per film for music than for either screenwriting or directorial services. Indeed, the median figures for each category of expenditure indicate that the typical cost of acquisition of music was approximately one-quarter the average costs of acquiring either screenwriting or directorial services. (Tr. 619; SMC Exh. K.)

Utilizing this four-to-one ratio, SMC argues that the 1.2 percent figure for pay cable residuals contained in the collective bargaining agreements for screenwriters and directors should be reduced by seventy-five percent, to .3 percent, to account for the fair market value of music use in the presentation of SMC programming. This would leave us with a value of about eight cents per subscriber for all music used on SMC. (Tr. 620–21.) Although SMC points out that a substantial quantity of music on its programming comes from the repertory of BMI—thus justifying a reduction of the already reduced figure to account only for ASCAP's share of the music used on SMC—it nonetheless proposes to ignore this final reduction and argues simply that any fee award for a blanket license should not exceed eight cents per subscriber.

Even if we accept *arguendo* the initial premise of SMC's argument—that the performing rights societies exert such control of the market for music rights as to preclude any reliance on negotiated agreements—its analysis in this case does not itself yield a reasonable measure of a fee

for ASCAP's license. This conclusion flows from certain technical problems with its methodology and from the fact that its analysis assumes that what the court should be valuing is simply the market value of music as an element of the program, rather than the value of the blanket license itself.

On its face, SMC's attempt to look to the market for other creative inputs as a means of measuring what the market would charge for music acquisition by cable companies is plausible. Its method of doing so, however, is open to serious question. The initial problem with SMC's approach to measuring the value of music is its reliance upon the guild agreement provisions for payment of residuals to screenwriters and directors. These provisions are part of an extensive set of contractual terms that also govern up-front compensation, benefits, and an array of working conditions for writers and directors. It is fair to assume that in any negotiation that encompasses as many disparate issues as do the guild agreements, the negotiators will agree to tradeoffs among the various negotiated items, with one side giving ground on some issues in exchange for concessions from the other side in other areas. The process of negotiation is thus likely to yield a complex pattern of results, most of which would have been different if the individual issue had been negotiated entirely separately from the others. Accordingly, plucking one term out of the contract is likely to yield a fairly arbitrary result.[38] Although at least one witness for SMC opined that these provisions reflect a reasonable valuation of the rights that are involved (Tr. 773, 784), this conclusory assertion was unsupported by any explanation of the basis for the proffered opinion, and is therefore unpersuasive. (*Compare*

37. SMC did not compile equivalent data for acting services since those payments vary so substantially as to be unreliable indicators of anything. (Tr. 691–92.)

38. The record contains no evidence as to either the genesis of the provision for the 1.2 percent residual rate, or the course of the negotiations that led to its inclusion in the two collective bargaining agreements. (*See also* Deposition of Harvey Finkel at 39 (SMC Exh. J–1) (residuals are just a fact of life under guild agreements and are not addressed in negotiations).)

Fagan Dep. at 131–32.) [39]

The next step in the analysis by SMC, which involves a reduction by three-quarters in the payments contained in the guild agreements, is equally open to question, even though it is conceded that producers generally pay somewhat less up front for music than for directorial or scriptwriting services. (Tr. 269.) I summarize only some of the problems with SMC's approach.

First, because of great difficulties in obtaining sensitive cost information from the film studios, SMC apparently settled for a smaller and somewhat different database from what it originally sought. (*E.g.*, Schindler Dep. at 21–22; Dorsey Dep. at 20–21; Deposition of Alida D. Camp at 9; Deposition of Christine M. Sims at 45.) [40] As an apparent result of the small sample size, the range of figures that one obtains by applying a 95 percent confidence interval to the various samples is so broad as to suggest little reliability in the median figures on which SMC relies. Second, and more important, there is no clear showing that the set of films ultimately included in the study are representative of the films shown on SMC (or cable television generally). (*See also* Finkel Dep. at 33.) This is of particular significance because the data reflects substantially different cost relationships from film to film and between film categories that are defined by intensity of music use. (*See* SMC Exhs. K & L; Schindler Dep. at 42; Finkel Dep. at 31; Camp Dep. at 20–21.) As a consequence of this, it appears that the results obtained are highly sensitive to the mix of films included in the sample. Of particular concern is that SMC's heavy, and apparently arbitrary, reliance on only a handful of film studios—which themselves seem to differ markedly in their relative spending on directorial and screenwriting services as compared to music services—suggests a likely bias in the sample. [41]

In addition, the premise of this exercise is somewhat undercut by the data on "up front" payments. Although directors and screenwriters receive identical residuals from cable replays, their "up front" payments differ substantially, with writers receiving on average approximately one-third more than directors. (Tr. 701.) Indeed, SMC's economist conceded that his model was not necessarily an accurate reflection of the real world. (Tr. 661.) [42]

Wholly apart from these technical concerns, SMC's invocation of the eight-cents-per-subscriber figure is conceptually flawed because it assumes that the licensee should pay only for the value of the music, rather than the value of the blanket license itself. As suggested in several earlier interim fee decisions, this is not the case. *See e.g.*, In re *Buffalo Broadcasting Co.*, Memorandum and Order at 22–26 (S.D.N.Y. Feb. 17, 1987); In re *Buffalo Broadcasting Co.*, Memorandum and Order at 32–36 (S.D. N.Y. June 17, 1985).

Acquisition of a blanket license transfers to the licensee the right to unlimited use of ASCAP's repertory for a specified time period. Although this is more music than a licensee such as SMC could conceivably

---

39. I assume for present purposes that the process of negotiating a collective bargaining agreement between the film-making industry and the guild is fairly analogous to the process by which supply and demand in a competitive market yield a pricing pattern. (*E.g.*, Tr. 275.) It should be noted, however, that the evidence on this question is extremely thin, and several film industry witnesses testified that the studios sometimes use directors or writers not covered by the guild agreements. How frequently this occurs is not indicated in the present record. (*See* Deposition of Martin Shindler at 23 (AS-CAP Exh. 27); *see also* Deposition of Patrick Joseph Dorsey at 32 (SMC Exh. J–2).)

40. The depositions of Ms. Camp and Ms. Sims were received as SMC Exhs. J–3 and J–4, respectively.

41. When questioned about this potential bias, SMC's economist could shed no light on it other than to note that SMC's attorneys had assured him that they knew of no such bias. (Tr. 684.)

42. One possible explanation for variations between payments "up front" to music suppliers, on the one hand, and to directors and writers, on the other, is the fact that the latter are limited by collective bargaining agreements as to residual payments whereas the former are not. (*See* Schindler Dep. at 46–47; Dorsey Dep. at 54, 60–61.)

make use of during the license period, the blanket license has a major benefit for the licensee—in conjunction with blanket licenses from the other performing rights societies, it ensures that the licensee need not attempt to locate the copyright owners of each composition included in its year-long programming and negotiate separately with each an acceptable fee. It represents, in effect, an insurance policy against copyright liability for the full range of the cable company's acquired programming. (*E.g.,* Tr. 470, 579–80.)

This unique feature of the blanket license, which sets it apart from any other form of licensing—whether direct licensing, source licensing, or a per-program license from the performing rights society—was explicitly noted by the Supreme Court and Second Circuit in *CBS* and by the Second Circuit in *Buffalo Broadcasting. See BMI v. CBS, supra,* 441 U.S. at 21–22 [99 S.Ct. at 1563]; *CBS v. ASCAP, supra,* 620 F.2d at 939; *Buffalo Broadcasting, Inc. v. ASCAP, supra,* 744 F.2d at 927, 932; *id.* at 934 (Winter, J. concurring). The significance of this point for our analysis is somewhat different but nonetheless not wholly divorced from the analysis in those cases.

SMC is, for the most part, not the producer of programming, but rather the purchaser of previously produced programming.[43] It is therefore not purchasing music as such, but rather the right to exhibit the programming that it wishes to offer, including the music that the original producer has caused to be incorporated on the sound track.[44] Moreover, because of the apparent impracticality at this stage and in this industry of obtaining source or direct licensing for all programming except at greater cost than the blanket license, the cable supplier is deriving a significant benefit by purchasing the service of aggregation—in effect the avoidance of substantial cost and uncertainty that would be faced in the absence of an ASCAP blanket license.

Thus, if we are to talk of competitive pricing, we must start with the premise that the relevant market is one for aggregative performance licenses, not the market for the services of individual composers and musicians. Since SMC's method of valuation looks to payments by producers for the initial acquisition of music or other creative services, it does not fully reflect the benefits conveyed by a performing rights society blanket license to a cable programming service.

To measure the full value of the blanket license, we must account for not only the market value of acquisition of the music for particular programs but also the market value of the aggregative function of the license. In a hypothetical purely competitive market, this would presumably translate to the cost to the performing rights society and its members of providing the music and the aggregative feature plus whatever rate of return is necessary to justify the supplier remaining in that line of business. If, on the other hand, we posit a market characterized by a degree of competitiveness that does not fully match this pristine state of affairs, the fees awarded would presumably be still higher.[45]

---

**43.** Although SMC supplies some originally produced programs, the vast bulk of its programming consists of films and other programs that have been produced by others, who then sell SMC the right to arrange for their exhibition on cable television. (JPS at ¶ 11–14.)

**44.** One of the trial witnesses noted that on occasion the music on the sound track of a film has been removed from the video cassette version and a separate set of music incorporated because of difficulties in obtaining clearance for use of the original music. (Tr. 733.) Whether this is generally feasible for cable program suppliers is not clear on the present record, but it is to be doubted since otherwise the program sup-

pliers would presumably have done this to avoid the ASCAP blanket license. (*See, e.g.,* Schlieff Dep. at 60.)

**45.** SMC argues that, if ASCAP did not offer a blanket license, the film producers or distributors might well provide source licensing and thereby actually save the cable programmers some money. (Tr. 565–71.) This may well be the case, but on the current record the actual costs (or savings) that would be realized without the blanket license are entirely speculative. (*See, e.g.,* Tr. 768–69) (conceding that, without ASCAP and BMI, acquisition of performance rights might cost more.)

There is no direct evidence in the record of the costs associated with the supplying of music rights in gross to the licensees. The record does reflect that ASCAP's administrative costs account for about 20 percent of its revenues generally (Tr. 619, 622–23), but there is no evidence in the record as to the relationship of expenses to revenues in connection with the blanket licenses offered to the cable companies. Moreover, as noted before, there is no reason to assume that a perfectly competitive market is the appropriate model for rate-setting here, and, in view of the wording of the Consent Decree as well as the policies embodied in the Copyright Act, there is some reason to conclude otherwise. In any event this analysis indicates that even if SMC's approach had sufficient statistical validity, its suggested result would have to be increased by some unstated amount to account for the nature of the services that are being provided under the blanket license.

In sum, I conclude that the approach proffered by SMC does not yield a fully defensible result. Although it is at least suggestive of the fact that the rate urged by ASCAP is excessive under relevant standards, it cannot by itself provide a reliable measure of a reasonable rate.

## D. A Reasonable Rate

The foregoing analysis suggests that neither the approach of ASCAP nor that of SMC to the formulation of a reasonable rate is wholly satisfactory. It is equally apparent that a "reasonableness" inquiry does not lend itself to the application of a clear and simple formulation and ultimately involves some conceded arbitrariness on the part of the rate setter. *See* Cirace, *supra*, 47 Ford.L.Rev. at 277 ("there is no

economically meaningful method of determining a competitive price.").

It is not surprising that the drafters of the relevant decree provisions themselves eschewed finely focussed formulations and contented themselves—both in the decree and in their presentations to the Court that approved it—with such general criteria as the avoidance of "exorbitant" fees, and the imposition of a "reasonable" or "fair" rate. (*See* Joint Exhs. 44, 45). Indeed, this approach is foreshadowed in the line of cases that apparently were the source of the reasonable rate provision; in those cases the courts have struggled to define the appropriate standard with some degree of concreteness and have generally conceded in the end that the determination of a "reasonable" fee for use of a product or service was a very impressionistic process. *See, e.g., U.S. v. Hartford Empire Co., supra,* 65 F.Supp. at 275–76.

On a more general level, the courts have been equally candid in noting the absence of any uniquely acceptable formula for either the setting of rates in regulated industries or the judicial review of rate-setting by the authorized administrative agencies. *See, e.g., In re Permian Basin Area Rate Cases,* 390 U.S. 747, 790–92 & n. 59 [88 S.Ct. 1344, 1372–73 n. 59, 20 L.Ed.2d 312] (1968). *See also Duquesne Light Co. v. Barasch,* [488 U.S. 299] 109 S.Ct. 609, 616 [102 L.Ed.2d 646] (1989) (quoting, *inter alia, Smyth v. Ames,* 169 U.S. 466, 546 [18 S.Ct. 418, 433, 42 L.Ed. 819] (1898)); Edgerton, "Value of the Service as a Factor in Rate Making," 32 Harv.L.Rev. 516, 540–46 (1919). As the Supreme Court recently noted in a related context: "The economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result." *Duquesne Light Co. v. Barasch, supra,* 109 S.Ct. at 619.[46]

---

**46.** Similar comments are found in *Permian Basin* concerning utility rate setting:

> Economists have frequently proven more candid about these difficulties. Social welfare and public interest standards have been described as "almost unique in the extreme vagueness of [their] ultimate verbal norm." Bonbright, *supra,* at 27. Similarly, it is said that no writer "whose views on public utility

rates command respect purports to find a single yardstick by sole reference to which rates that are reasonable or socially desirable can be distinguished from rates that are unreasonable or adverse to the public interest. *Id.* at 67. But compare *National Broadcasting Co. v. United States,* 319 U.S. 190, 216, 63 S.Ct. 997, 1009, 87 L.Ed. 1344 [1943].

390 U.S. at 790 n. 59 [88 S.Ct. at 1372 n. 59].

In general terms the courts reviewing rate-making decisions have looked to whether those decisions have (1) compensated the producer or supplier for its costs, (2) provided a sufficient return on capital to compensate investors for their risk, and (3) ensured both financial integrity and further necessary investment, while at the same time (4) adequately protecting the legitimate interests of purchasers of those goods or services and any other cognizable public interests defined by the governing statutes. *See, e.g., In re Permian Basin Area Rate Cases, supra,* 390 U.S. at 792 [88 S.Ct. at 1373].[47] Furthermore, to the extent that the suppliers' costs—the most basic and, in many cases, most readily available data—do not yield a precise result, it is at least arguable that the value of the product or service to the consumer may also be taken into account. *See, e.g.,* Edgerton, *supra,* 32 Harv.L.Rev. 516. *See also Buffalo Broadcasting Co. v. ASCAP, supra,* 744 F.2d at 926–27 (whether price of per-program license is "too costly" depends upon whether price "is higher than the value of the rights obtained").

This form of analysis cannot be literally applied to our case. There is no record reflecting the "cost" of music production as such, nor could there reasonably be since the principal information that seems relevant is the living expenses of the individual composer and such minimal overhead as he might incur in carrying out his composing activities, and this scarcely seems a reasonable basis for establishing a fee. In any event, the record contains no data on these matters. As for return on investment or encouragement of further investment, again this is not directly applicable here since we are not engaged in regulating the price of corporate production, and in any event there is no information in the record concerning what level of fees would be necessary to provide a continuing incentive for composers to compose. *See generally* Cirace, *supra,* 47 Ford.L.Rev. at 305.

In exploring alternative avenues we are left principally with the two forms of analysis proffered by the litigants, and an array of rates that might be derived depending upon the precise terms of that analysis. In assessing those alternatives, the general goal is to arrive at a rate that would not reward ASCAP for the exercise of any leverage that may be inconsistent with generally accepted antitrust principles while still providing its members with a return for their labors that is generally commensurate with the value that a competitive market would place on both the musical fruits of those efforts and the benefits offered by the blanket license.

Since we have no free market in the rights conveyed by a blanket license, the principal data must perforce be specific negotiated agreements, although these results necessarily must be modified to the degree that they are believed to be influenced by considerations deemed inappropriate for our present analysis. For reasons already noted, the HBO and Disney results probably overstate the range of reasonable rates. Similarly, because SMC's analysis does not adequately account for the range of rights conveyed by the blanket license, it probably understates the range of appropriate rates even if one were to ignore the degree of random error and bias that appears to pervade the selection and use of the sample.

Between these two extremes, the most obvious alternative approach looks to an arguably comparable type of agreement— the arrangements entered into by BMI with licensees such as SMC and others similarly situated. Such an analogy is based upon the fact that BMI provides a service comparable to that of ASCAP and thus, in the absence of reliable direct indicia of a fair rate for ASCAP, can at least provide a useful benchmark for such a measurement.

---

47. Of course, the specific criteria utilized by the rate setters in those cases will vary to some extent depending upon the specifics of the regulatory statute in question. *See, e.g., Pennell v.*

*City of San Jose,* [485 U.S. 1] 108 S.Ct. 849, 857–58 [99 L.Ed.2d 1] (1988) (challenge to statutory provision authorizing consideration of hardship to tenant in setting residential rents.).

Both sides offer arguments against direct reliance on the BMI agreements, although ASCAP's opposition is far more strongly pressed. SMC would view BMI as holding a monopoly power equivalent to that of ASCAP since the two organizations are functionally indistinguishable. Accordingly, it suggests, any agreement achieved by BMI with its licensees, even if significantly less remunerative than the ASCAP licenses, should be viewed as the product of coercive market power and thus an inappropriate measure of reasonable fees. In contrast ASCAP challenges the BMI rate as the product, in effect, of a "sweetheart" arrangement because BMI is an instrument of the broadcast industry and thus does not seriously defend its members' interests. ASCAP also argues that since HBO and Disney agreed to pay ASCAP far more than BMI, necessarily BMI's license must be deemed less valuable.

Neither view is persuasive. Although BMI performs a role equivalent to that of ASCAP—indeed, that is the basis for looking to its agreements as a guide for an ASCAP fee—it is not at all clear that it has or chooses to exert the type of leverage that SMC attributes to it. Indeed, even if we disregard entirely the alternatives to the blanket license that would-be licensees may potentially have with respect to both BMI and ASCAP, it must be noted that BMI operates under a potential disadvantage compared to ASCAP in that it does not have a rate court to which it can repair to obtain a fee order; although it can sue unlicensed users for copyright infringement, this does not give it a means of prompt redress or ensure a continuing flow of revenue to its members, a fact that may encourage it to be more forthcoming in negotiations.[48] In any event, it appears to be the fact that in the past BMI has not negotiated as aggressively as ASCAP with the cable program suppliers. It may therefore be fairly inferred that the results of its dealings with those licensees reflect in effect a greater equality of negotiating leverage than do the ASCAP agreements. Under these circumstances BMI's agreements may provide guidance in assessing an appropriate rate for ASCAP since equality of bargaining power is likely to result in rates that are reasonable, even if not precise, measures of what a free market would yield. *See, e.g., Sobel, supra,* 3 Loyola Ent.L.J. at 39. *But cf.* Cirace, *supra,* 47 Ford.L.Rev. at 281–85 (discussing impact of bilateral monopoly on pricing).

As for ASCAP's argument that BMI's *bona fides* are suspect, it is not especially telling for two reasons. First, it is unsupported by any evidence other than the fact that BMI has agreed to lower rates than has ASCAP. Second, even if BMI is deliberately staying its own hand as an aid to its network founders, this does not change the ultimate conclusion; because BMI in practice does not appear to exert the same degree of bargaining leverage as ASCAP, the balance of power at the BMI bargaining table appears to be more equal than is the case with ASCAP, and hence the results of those negotiations may be significant for our purposes.

Finally, I note that in those instances in which ASCAP and BMI have agreed upon the distribution of a common royalty fund —specifically, the compulsory fees paid by cable systems operators for re-transmission of programs—they have arranged for a far more equal distribution of the fund than is reflected in their respective licensing agreements with HBO and Disney. Thus, as noted before, in their most recent agreement, ASCAP receives only approximately fifty-five (55%) percent of the available fund. (Joint Exh. 42.) This too suggests that BMI's agreed-upon rates have some probative weight for setting ASCAP fees.

The foregoing analysis indicates that the negotiated BMI rates for SMC and comparable licensees are a fair starting point for setting an ASCAP fee. The most recent agreements between BMI and both SMC and HBO involve payments of between $0.12 and $0.13 per subscriber. (*See* Joint Exh. 21; ASCAP Exh. E; Tr. 476–79.) The

---

48. In contrast, ASCAP may seek interim fees under the consent decree pending the resolution of the final fee question, whether by negotiation or by litigation.

question remains, however, whether any adjustment is appropriate for purposes of setting a rate for ASCAP.

In valuing what is being offered, one may fairly note that the ASCAP license offers somewhat more than the BMI license in the narrow sense that it permits unlimited use of a repertory that is significantly larger, by a factor of approximately three. Although both licenses may, as a practical matter, be necessary, the cost of foregoing the blanket license of ASCAP is likely to be higher since SMC apparently uses more ASCAP music (Tr. 84–91; AS-CAP Exh. 4)[49] and therefore it is probable that more of SMC's programs contain AS-CAP music than contain BMI music.[50] Thus the alternatives of either foregoing programming containing ASCAP music or seeking other forms of licensing for such programs would likely be more costly to the licensee than would the equivalent steps in lieu of a BMI license. In short, the ASCAP blanket license may be viewed as conveying somewhat more value to the licensee than does the BMI license.

Under these circumstances, some differential between the BMI and ASCAP rates is reasonable. See Edgerton, supra, 32 Harv.L.Rev. at 556 (where pricing on cost basis yields a range of possible rates, the benefit to the purchaser can be used to influence where the price is set within that range). See also Buffalo Broadcasting Co. v. ASCAP, supra, 744 F.2d at 926–27 (discussing comparison of price and value received). As for the size of the differential, it may fairly be based on the very figures agreed to by ASCAP and BMI between themselves in their allocation of the Copyright Tribunal fund for cable operators' program retransmissions.

As noted, the most recent of these agreements divided the moneys in question on the basis of a 55 percent–45 percent split. (See Joint Exh. 42.) Applying the same ratio to a $0.12 per subscriber figure (see ASCAP Exh. E; Tr. 476–79), we arrive at an adjusted rate of approximately $0.15 per subscriber.[51]

In sum, the annual fee for SMC's blanket license from ASCAP for the period from April 4, 1984 to December 31, 1988 is set at $0.15 for each subscriber to the cable services provided by SMC.[52]

## II. The Per–Program License Issue

At some point in the course of negotiations between the parties, ASCAP took the position that SMC was not entitled to a per-program license and apparently declined at that stage to quote any fee for such a license. (Tr. 117, 120.) At no time until the trial did SMC seek judicial relief

---

**49.** ASCAP's data on this issue—suggesting that approximately two-thirds of the music on SMC is ASCAP music—is subject to methodological question. (Tr. 144–53.) Nonetheless, even if we disregard the ASCAP estimate, it is fair to infer that ASCAP music is more frequently used in view of the disparity in the respective repertories.

**50.** Some programs undoubtedly contain music from both societies.

**51.** This figure seems supportable not only by reference to the BMI agreements with HBO and with ASCAP, but also, in general terms, by reference to the admissible data proffered by both sides in support of their respective positions. As noted, the most recent HBO license agreement appears to reflect in some part not only a degree of inequality in bargaining leverage between ASCAP and HBO, but also some implicit value in the "most favored nation" provision, as well as possibly some erroneous expectations by

HBO concerning future financial prospects. If each of these considerations were assigned some value, even if concededly arbitrary, and if the $0.25-per-subscriber figure were reduced accordingly, it is reasonable to expect that the resultant figure would not be too far off the $0.15 fee arrived at here.

As for SMC's analysis, if one chose a ratio of 1:3 rather than 1:4 between the cost of music acquisition and the costs of directorial or screenwriting services, and then added, again somewhat arbitrarily, a thirty-percent increment for the aggregative feature of the blanket license, the resulting figure would be quite close to $0.15 per subscriber.

**52.** Both parties have addressed the blanket fee question solely in terms of a "per subscriber" formula, and accordingly I have done so as well. This approach is not necessarily the only defensible one either in this case or in the case of any other licensee, and both ASCAP and other applicants will of course be free in other proceedings to argue for different formulations.

from this refusal to quote a per-program fee, apparently because it was intent upon achieving a satisfactory blanket license agreement.

As part of its contentions enumerated in the joint pre-trial statement, SMC asserted that it is entitled to a per-program license on demand, and it therefore requested an order requiring ASCAP to quote a rate. (JPS at ¶¶ 120–23). Although SMC appeared alternatively in its portion of the Joint Pretrial Statement and its post-trial Memorandum to request that this Court impose a fee, it offered no evidence at trial relevant to such a determination.

In response ASCAP urges that SMC should be barred from obtaining court intervention either because it has shown no real interest in such a license in the course of negotiations or because the Consent Decree does not entitle it to such a license. Alternatively ASCAP asserts, and has proffered testimony, that it has been and remains willing to negotiate a per-program fee for SMC. (*See* Tr. 822–24.)

ASCAP's interpretation of the Decree rests upon its reading of Article VII(B), which directs it, in effect, to issue per-program licenses on written request by "any unlicensed radio or television broadcaster...." According to ASCAP, SMC is not a television "broadcaster" within the meaning of the Decree. In support of this reading ASCAP offers principally a laundry list of perceived technological and economic differences between a cable television program supplier, such as SMC, and over-the-air television stations or networks, which are concededly covered by this provision. SMC of course argues the contrary.

As a technical matter, since SMC has requested of ASCAP a fee quote for a per-program license and ASCAP has declined to give one, there is jurisdiction in this Court to adjudicate the issue of SMC's entitlement to such a license.[53] Nonetheless, since the record reflects without contradiction that ASCAP is prepared to negotiate a fee for such a license, it does not appear at this stage that we face a live controversy requiring a definitive interpretation of the disputed provision. Although SMC appears now also to be seeking an order setting an appropriate fee, this can scarcely be done on the current record. Moreover, in view of the evident priority that the Consent Decree gives to the negotiation of fees by the parties, *see, e.g., United States v. ASCAP, supra,* 586 F.Supp. at 730–31; In re *Home Box Office, Inc.,* Memorandum and Order at 18 (S.D. N.Y. July 11, 1986), it is appropriate in the present circumstances to give the parties an opportunity to arrive at an agreed-upon figure if SMC wishes to pursue the matter.

Rather than adjudicate the abstract issue of entitlement or attempt to set a fee in a vacuum, the Court will simply direct that ASCAP quote a per-program fee to SMC within seven (7) days, and undertake good-faith negotiations with SMC concerning the terms of such a license. If, within twenty one (21) days after ASCAP proposes a fee, the parties have been unable to reach an agreement, either may come to the Court to seek appropriate relief.[54]

## CONCLUSION

For the reasons stated, the Court determines that a "reasonable fee" for a blanket license for SMC for the period from April

---

**53.** In the present circumstances I do not view SMC's delay in raising this issue in court as tantamount to a waiver. My conclusion in this regard is heavily influenced by the fact that the Decree contains no time limits and the courts have imposed none for invoking judicial intervention. In the future, however, licensees under the Decree will be expected to act with reasonable dispatch in seeking court relief once negotiations have foundered, particularly if delay may cause either prejudice to ASCAP or otherwise avoidable prolongation of judicial proceedings. The latter is surely the case in this instance since SMC's delay could require future litigation of the per-program issues after trial of the blanket license fee question.

**54.** The Consent Decree provides for a sixty (60) day interval. Since, however, it is conceded that at an earlier time ASCAP refused to quote a fee, this provision is not directly applicable and the Court may shorten the time period in question. That is certainly appropriate here since we are dealing with a licensing period that ended more than nine months ago.

4, 1984 through December 31, 1988 shall be set at $0.15 per subscriber to the SMC services during the relevant period. The fee payable should be computed monthly to conform to the records of SMC reflecting the number of SMC subscribers.

With respect to SMC's application for a per-program license, the Court directs that ASCAP transmit a proposal for such a license fee to SMC within seven (7) days and undertake good-faith negotiations with SMC concerning the terms of such a license for a period of twenty-one (21) days. This directive is based upon ASCAP's representation of willingness to negotiate such a license with SMC and is without prejudice to its position that the Consent Decree does not compel it to issue a per-program license to SMC. If the parties cannot reach agreement within the specified time period, either party may seek appropriate judicial relief.

DATED: New York, New York

October 12, 1989

SO ORDERED.

/s/ Michael H. Dolinger
MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE

Copies of the foregoing Memorandum and Order have been transmitted this date to:

Allan Blumstein, David E. Nachman, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for American Society of Composers, Authors and Publishers.

Kenneth L. Steinthal, Evie C. Goldstein, Weil, Gotshal & Manges, New York City, for Showtime/The Movie Channel, Inc.